DAVID A. FOXMAN AND DOROTHY A. FOXMAN, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 93416, 93460, 93472. Filed January 16, 1964.

*Bernard J. Long,* for the petitioners in docket Nos. 93416 and 93472.
*Sidney L. Cramoy,* for the petitioners in docket No. 93460.
*Alvin C. Martin,* for the respondent.

---

[1] Proceedings of the following petitioners are consolidated herewith: Norman B. Jacobowitz and Laura Jacobowitz, docket No. 93460; and Horace W. Grenell and Judith Grenell, docket No. 93472.

OPINION

Raum, *Judge:* 1. *Tax consequences of termination of Jacobowitz's interest in Abbey; the agreement of May 21, 1957.*—On May 21, 1957, Jacobowitz's status as a partner in Abbey came to an end pursuant to an agreement executed on that day. The first issue before us is whether Jacobowitz thus made a "sale" of his partnership interest to Foxman and Grenell within section 741 [2] of the 1954 Code, as contended by him, or whether the payments to him required by the agreement are to be regarded as "made in liquidation" of his interest

---

[2] SEC. 741. RECOGNITION AND CHARACTER OF GAIN OR LOSS ON SALE OR EXCHANGE.

In the case of a sale or exchange of an interest in a partnership, gain or loss shall be recognized to the transferor partner. Such gain or loss shall be considered as gain or loss from the sale or exchange of a capital asset, except as otherwise provided in section 751 (relating to unrealized receivables and inventory items which have appreciated substantially in value).

548

within section 736,[3] as contended by Foxman and Grenell. Jacobowitz treated the transaction as constituting a "sale," and reported a capital gain thereon in his return for 1957. Foxman and Grenell, on the other hand, treated the payments as having been "made in liquidation"[4] of Jacobowitz's interest under section 736, with the result that a substantial portion thereof reduced their distributive shares of partnership income for the fiscal year ending February 28, 1958.

The Commissioner, in order to protect the revenues, took inconsistent positions. In Jacobowitz's case, his determination proceeded upon the assumption that there was a section 736 "liquidation," with the result that payments thereunder were charged to Jacobowitz for the partnership fiscal year ending February 28, 1958, thus not only attributing to Jacobowitz additional income for his calendar year 1958 but also treating it as ordinary income rather than capital gain. In the cases of Foxman and Grenell, the Commissioner adopted Jacobowitz's position that there was a section 741 "sale" on May 21, 1957, to Foxman and Grenell, thus disallowing the deductions in respect thereof from the partnership's income for its fiscal year ending February 28, 1958; as a consequence, there was a corresponding in-

---

[3] SEC. 736. PAYMENTS TO A RETIRING PARTNER OR A DECEASED PARTNER'S SUCCESSOR IN INTEREST.

(a) PAYMENTS CONSIDERED AS DISTRIBUTIVE SHARE OR GUARANTEED PAYMENT.—Payments made in liquidation of the interest of a retiring partner or a deceased partner shall, except as provided in subsection (b), be considered—

(1) as a distributive share to the recipient of partnership income if the amount thereof is determined with regard to the income of the partnership, or

(2) as a guaranteed payment described in section 707(c) if the amount thereof is determined without regard to the income of the partnership.

(b) PAYMENTS FOR INTEREST IN PARTNERSHIP.—

(1) GENERAL RULE.—Payments made in liquidation of the interest of a retiring partner or a deceased partner shall, to the extent such payments (other than payments described in paragraph (2)) are determined, under regulations prescribed by the Secretary or his delegate, to be made in exchange for the interest of such partner in partnership property, be considered as a distribution by the partnership and not as a distributive share or guaranteed payment under subsection (a).

(2) SPECIAL RULES.—For purposes of this subsection, payments in exchange for an interest in partnership property shall not include amounts paid for—

(A) unrealized receivables of the partnership (as defined in section 751(c)), or

(B) good will of the partnership, except to the extent that the partnership agreement provides for a payment with respect to good will.

Section 707(c), made applicable by section 736(a)(2), *supra*, provides as follows:

SEC. 707. TRANSACTIONS BETWEEN PARTNER AND PARTNERSHIP.

(c) GUARANTEED PAYMENTS.—To the extent determined without regard to the income of the partnership, payments to a partner for services or the use of capital shall be considered as made to one who is not a member of the partnership, but only for the purposes of section 61(a) (relating to gross income) and section 162(a) (relating to trade or business expenses).

[4] "Liquidation" of a partner's interest is defined in section 761(d) as follows:

SEC. 761. TERMS DEFINED.

(d) LIQUIDATION OF A PARTNER'S INTEREST.—For purposes of this subchapter, the term "liquidation of a partner's interest" means the termination of a partner's entire interest in a partnership by means of a distribution, or a series of distributions, to the partner by the partnership.

crease in the distributive partnership income of Foxman and Grenell for that fiscal year which was reflected in the deficiencies determined for the calendar year 1958 in respect of each of them.

As is obvious, the real controversy herein is not between the various petitioners and the Government,[5] but rather between Jacobowitz and his two former partners. We hold, in favor of Jacobowitz, that the May 21, 1957, transaction was a "sale" under section 741.

The provisions of sections 736 and 741 of the 1954 Code have no counterpart in prior law. They are contained in "Subchapter K" [6] which for the first time, in 1954, undertook to deal comprehensively with the income tax problems of partners and partnerships.

That a partnership interest may be "sold" to one or more members of the partnership within section 741 is not disputed by any of the parties. Indeed, the Income Tax Regulations, section 1.741-1(b), explicitly state:

Sec. 1.741-1  Recognition and character of gain or loss on sale or exchange.

\*          \*          \*          \*          \*          \*          \*

(b) Section 741 shall apply whether the partnership interest is sold to one or more members of the partnership or to one or more persons who are not members of the partnership. \* \* \*

And it is clear that in such circumstances, sections 736 and 761(d), do not apply. See regulations, sec. 1.736-1(a)(1)(i):

Sec. 1.736-1  Payments to a retiring partner or a deceased partner's successor in interest.

(a) *Payments considered as distributive share or guaranteed payment.* (1)(i) Section 736 and this section apply only to payments made to a retiring partner or to a deceased partner's successor in interest in liquidation of such partner's entire interest in the partnership. See section 761(d). \* \* \* Section 736 and this section apply only to payments made by the partnership *and not to transactions between the partners.* Thus, a sale by partner A to partner B of his entire one-fourth interest in partnership ABCD would not come within the scope of section 736. [Italics supplied.]

Did Jacobowitz *sell* his interest to Foxman and Grenell, or did he merely enter into an arrangement to receive "payments \* \* \* in liquidation of [his] \* \* \* interest" from the partnership? We think the record establishes that he sold his interest.

At first blush, one may indeed wonder why Congress provided for such drastically different tax consequences, depending upon whether the amounts received by the withdrawing partner are to be classified as the proceeds of a "sale" or as "payments \* \* \* in liquidation"

---

[5] The Government has undertaken, on brief for the first time, to support Jacobowitz's position.

[6] "Subchapter K" is a subdivision of "Chapter 1" of "Subtitle A" which contains the income tax provisions of the Code.

of his interest.[7] For, there may be very little, if any, difference in ultimate economic effect between a "sale" of a partnership interest to the remaining partners and a "liquidation" of that interest. In the case of a sale the remaining partners may well obtain part or all of the needed cash to pay the purchase price from the partnership assets, funds borrowed by the partnership or future earnings of the partnership. See A.L.I., Federal Income Taxation of Partners and Partnerships 176 (1957). Yet the practical difference between such transaction and one in which the withdrawing partner agrees merely to receive payments in liquidation directly from the partnership itself would hardly be a meaningful one in most circumstances.[8] Why then the enormous disparity in tax burden, turning upon what for practical purposes is merely the difference between Tweedledum and Tweedledee, and what criteria are we to apply in our effort to discover that difference in a particular case? The answer to the first part of this question is to be found in the legislative history of subchapter K, and it goes far towards supplying the answer to the second part.

In its report on the bill which became the 1954 Code the House Ways and Means Committee stated that the then "existing tax treatment of partners and partnerships is among the most confused in the entire tax field"; that "partners * * * cannot form, operate, or dissolve a partnership with any assurance as to tax consequences"; that the proposed statutory provisions [subchapter K] represented the "first comprehensive statutory treatment of partners and partnerships in the history of the income tax laws"; and that the "principal objectives have been simplicity, flexibility, and equity as between the partners." H. Rept. No. 1337, 83d Cong., 2d Sess., p. 65. Like thoughts were expressed in virtually identical language by the Senate Finance Committee. S. Rept. No. 1622, 83d Cong., 2d Sess., p. 89.

---

[7] If the transaction were a "sale" under section 741, Jacobowitz's gain would be taxed as capital gain (there being no section 751 problem in respect of unrealized receivables or inventory items which have appreciated substantially in value), and would be reportable in 1957 rather than in 1958. On the other hand, if the transaction were a section 736 "liquidation," the amounts received by him (to the extent that they were not for his "interest * * * in partnership property" pursuant to section 736(b)(1)) would be taxable as ordinary income and would be reportable by him in 1958, rather than in 1957. The tax liabilities of the remaining partners, Foxman and Grenell, would be affected accordingly, depending upon whether section 736 or 741 governed the transaction.

[8] The only difference suggested by counsel for Foxman and Grenell, for the first time in their reply brief, is that in the event of bankruptcy of the partnership the liability to the withdrawing partner might be subject to a different order of priority depending upon whether there is involved the liability of the partnership itself, as in the case of a "liquidation," or the liability of the purchasing partners, as in the case of a "sale." However, it stretches credulity to the breaking point to assume that any such consideration motivated the parties in determining to enter into a "sale" rather than a "liquidation," or vice versa, where the only immediate matter of economic consequence was the substantial difference in tax liability depending upon which course was followed.

Although there can be little doubt that the attempt to achieve "simplicity" has resulted in utter failure,[9] the new legislation was intended to and in fact did bring into play an element of "flexibility." Tax law in respect of partners may often involve a delicate mechanism, for a ruling in favor of one partner may automatically produce adverse consequences to the others. Accordingly, one of the underlying philosophic objectives of the 1954 Code was to permit the partners themselves to determine their tax burdens *inter sese* to a certain extent, and this is what the committee reports meant when they referred to "flexibility." The theory was that the partners would take their prospective tax liabilities into account in bargaining with one another.[10] Nor is this concept before us for the first time. We considered it in the interpretation of some related provisions of section 736 in *V. Zay Smith*, 37 T.C. 1033, affirmed 313 F. 2d 16 (C.A. 10), involving payments in respect of goodwill in the liquidation of a partner's interest. We there said (37 T.C. at 1038) :

This interpretation will also make for the flexibility and equity between the partners stressed by Congress. It will allow the partners flexibility in that they may determine the tax consequences of a liquidation payment by the choice of words in the partnership agreement. * * *

Recurring to the problem immediately before us, this policy of "flexibility" is particularly pertinent in determining the tax consequences of the withdrawal of a partner. Where the practical differences between a "sale" and a "liquidation" are, at most, slight, if they exist at all, and where the tax consequences to the partners can vary greatly, it is in accord with the purpose of the statutory provisions to allow the partners themselves, through arm's-length negotiations, to determine whether to take the "sale" route or the "liquidation" route, thereby allocating the tax burden among them-

[9] The distressingly complex and confusing nature of the provisions of subchapter K present a formidable obstacle to the comprehension of these provisions without the expenditure of a disproportionate amount of time and effort even by one who is sophisticated in tax matters with many years of experience in the tax field. Cf. *Thomas G. Lewis,* 35 T.C. 71, where we had occasion to comment (p. 76) upon the exasperating efforts required to deal with certain other provisions of the 1954 Code. See also *Van Products, Inc.,* 40 T.C. 1018, 1028. If there should be any lingering doubt on this matter one has only to reread section 736 in its entirety, footnote 3, *supra,* and give an honest answer to the question whether it is reasonably comprehensible to the average lawyer or even to the average tax expert who has not given special attention and extended study to the tax problems of partners. Surely, a statute has not achieved "simplicity" when its complex provisions may confidently be dealt with by at most only a comparatively small number of specialists who have been initiated into its mysteries. For a critical discussion of the complexities of the 1954 Code see, generally, Cary, "The ALI Tax Project and the Code," 60 Col. L. Rev. 259.

[10] Whether this was a realistic assumption in view of the large number of small partnerships that may not have the benefit of the highly specialized tax advice required, or whether, in view of the almost incomprehensible character of some of the provisions in subchapter K, the parties could with confidence allocate the tax burden among themselves—these are matters on which we express no opinion. The point is that Congress did intend to provide a certain amount of "flexibility" in this respect.

selves.[11]   And in this case the record leaves no doubt that they intended to and in fact did adopt the "sale" route.[12]

The agreement of May 21, 1957, indicates a clear intention on the part of Jacobowitz to sell, and Foxman and Grenell to purchase, Jacobowitz's partnership interest.   The second "whereas" clause refers to Jacobowitz as "selling" his interest and part "First" of the agreement explicitly states not only that the "second parties [Foxman and Grenell] hereby purchase * * * the * * * interest of * * * [Jacobowitz] * * * in Abbey," but also that "the first party [Jacobowitz] does hereby sell" his interest in Abbey.   Thus, Foxman and Grenell obligated themselves *individually* to purchase Jacobowitz's interest.   Nowhere in the agreement was there any obligation on the part of Abbey to compensate Jacobowitz for withdrawing from the partnership.   Indeed, a portion of the consideration received by him was the Sound Plastics stock, not a partnership asset at all.   That stock was owned by Foxman and Grenell as individuals and their undertaking to turn it over to Jacobowitz as part of the consideration for Jacobowitz's partnership interest reinforces the conclusion that *they as individuals* were buying his interest, and that the transaction represented a "sale" of his interest to them rather than a "liquidation" of that interest by the partnership.   Moreover, the chattel mortgage referred to in part "First" of the agreement of May 21, 1957, states that Jacobowitz "has sold * * * his * * * interest as a partner."

In addition to the foregoing, we are satisfied from the evidence before us that Foxman and Grenell knew that Jacobowitz was interested only in a sale of his partnership interest.   The record convincingly establishes that the bargaining between them was consistently upon the basis of a proposed sale.[13]   And the agreement of May 21, 1957, which represents the culmination of that bargaining, reflects that understanding with unambiguous precision.   The subsequent

---

[11] See S. Rept. No. 1616, 86th Cong., 2d Sess., in respect of the proposed "Trust and Partnership Income Tax Revision Act of 1960" (H.R. 9662) :

"under present law even though there is no economic difference it is possible for partners to arrange different tax effects for the disposition of the interest of a retiring or deceased partner, merely by casting the transaction as a sale rather than a liquidating distribution (p. 76).

"* * * Under present law, if the transaction is in the form of a sale of an interest, then section 741 (rather than section 736) would govern, even though the interest of the selling partner is transferred to the other member of a two-man partnership (p. 103)."

[12] In *Bolling* v. *Patterson*, — F. Supp. — (N.D. Ala.), 7 A.F.T.R. 2d 1464, 1465, 61–1 U.S.T.C. par. 9417, the judge, in his charge to the jury, instructed it that the one question it *must* answer is did "the partners * * * intend to liquidate Ramsey's interest in the partnership or did the two partners * * * intend to buy and did Ramsey intend to sell * * * his partnership interest."

[13] Various items of evidence support this conclusion.   Of particular interest is the fact that the first payment to Jacobowitz, $67,500, was computed so as to enable him to report his gain as having been derived from an installment *sale*.   However, a miscalculation (by failing to take into account the Sound Plastics stock and the Chrysler automobile) resulted in Jacobowitz's receiving more than the permissible 30 percent in 1957 (sec. 453(b) (2) (A) (ii), 1954 Code), and he therefore reported his entire gain in his 1957 return.   The point remains, nevertheless, that a "sale" was planned and executed.

position of Foxman and Grenell, disavowing a "sale," indicates nothing more than an attempt at hindsight tax planning to the disadvantage of Jacobowitz.

Foxman and Grenell argue that Jacobowitz looked only to Abbey for payment, that he was in fact paid by Abbey, that there was "in substance" a liquidation of his interest, and that these considerations should be controlling in determining whether section 736 or section 741 applies. But their contention is not well taken.

Jacobowitz distrusted Foxman and Grenell and wanted all the security he could get; he asked for, but did not receive, guarantees from their wives and mortgages on their homes. Obviously, the assets of Abbey and its future earnings were of the highest importance to Jacobowitz as security that Foxman and Grenell would carry out their part of the bargain. But the fact remains that the payments received by Jacobowitz were in discharge of their obligation under the agreement, and not that of Abbey. It was they who procured those payments in their own behalf from the assets of the partnership which they controlled. The use of Abbey to make payment was wholly within their discretion and of no concern to Jacobowitz; his only interest was payment. The terms of the May 21, 1957, agreement did not obligate Abbey to pay Jacobowitz.

Nor is their position measurably stronger by reason of the fact that Jacobowitz was given promissory notes signed in behalf of Abbey. These notes were endorsed by Foxman and Grenell individually, and the liability of Abbey thereon was merely in the nature of security for their primary obligation under the agreement of May 21, 1957. The fact that they utilized partnership resources to discharge their own individual liability in such manner can hardly convert into a section 736 "liquidation" what would otherwise qualify as a section 741 "sale." It is important to bear in mind the object of "flexibility" which Congress attempted to attain, and we should be slow to give a different meaning to the arrangement which the partners entered into among themselves than that which the words of their agreement fairly spell out. Otherwise, the reasonable expectations of the partners in arranging their tax burdens *inter sese* would come to naught, and the purpose of the statute would be defeated. While we do not suggest that it is never possible to look behind the words of an agreement in dealing with problems like the one before us, the considerations which Foxman and Grenell urge us to take into account here are at best of an ambiguous character and are in any event consistent with the words used. We hold that the Commissioner's determination in respect of this issue was in error in Jacobowitz's case but was correct in the cases involving Foxman and Grenell. Cf. *Charles F. Phillips*, 40 T.C. 157; *Karan* v. *Commissioner*, 319 F. 2d 303 (C.A. 7).

2. *The $16,790 received by Jacobowitz from Abbey.*—During the period March 1, 1957, to May 21, 1957, inclusive, Jacobowitz received a total of $16,790 from Abbey, and reported it as ordinary income in his 1957 return. The Commissioner treated this item as reportable by Jacobowitz in 1958, but made a corresponding inconsistent adjustment in the cases of Foxman and Grenell by ruling that this amount was improperly subtracted from the partnership income for its fiscal year ending February 28, 1958, in computing the distributive shares of Foxman and Grenell. Jacobowitz now contends that this item represented merely a withdrawal of capital. We hold that Jacobowitz correctly reported this amount as ordinary income in his 1957 return, and that it was properly taken into account by Foxman and Grenell in the computation of their distributive shares of partnership income in their 1958 returns.

Section 702(a) requires a partner to take into account his distributive share of the partnership's taxable income in determining his income tax.[14] Section 704(a) provides that a partner's distributive share of income shall be determined by the partnership agreement.[15] Under section 761(c) a partnership agreement "includes any modifications of the partnership agreement made prior to, or at, the time prescribed by law for the filing of the partnership return for the taxable year (not including extensions) which are agreed to by all the partners, or which are adopted in such other manner as may be provided by the partnership agreement." The effect of such modification is that it relates back to the beginning of the taxable year in which the modification occurs. Thus the partners may, by agreement, adjust among themselves their interests in earnings and are taxable accordingly. Cf. *Hellman* v. *United States*, 44 F. 2d 83 (Ct. Cl.) ; *Raymond R. Goodlatte*, 4 B.T.A. 165 (acq. VI–2 C.B. 3).

Prior to May 21, 1957, the partners shared profits equally. In paragraph Fourth of the agreement of May 21, 1957, the following handwritten provision was inserted at the request of Jacobowitz:

First party [Jacobowitz] shall not be entitled to any further share of profits that may accrue since March 1, 1957 and may retain any sums received therefrom to date hereof.

Absent this modification of the partners' agreement to share net profits equally, Jacobowitz would have had to include in his tax-

---

[14] SEC. 702. INCOME AND CREDITS OF PARTNER.

(a) GENERAL RULE.—In determining his income tax, each partner shall take into account separately his distributive share of the partnership's—

* * * * * * *

(9) taxable income or loss, exclusive of items requiring separate computation under other paragraphs of this subsection.

[15] SEC. 704. PARTNER'S DISTRIBUTIVE SHARE.

(a) EFFECT OF PARTNERSHIP AGREEMENT.—A partner's distributive share of income, gain, loss, deduction, or credit shall, except as otherwise provided in this section, be determined by the partnership agreement.

able income for his taxable year ending December 31, 1957, one-third of Abbey's earnings during the period March 1, 1957, to May 21, 1957,[16] since the taxable year of Abbey closed on May 21, 1957, under section 706(c)(2)(A)(i) with respect to Jacobowitz, who sold his entire interest in Abbey at that time, although it did not close at that time, pursuant to section 706(c)(1), in respect of the remaining partners.[17]

The language "may retain any sums received therefrom to date hereof" plainly refers to the $16,790, which, the record shows, consists in part of "salary" and in part of "drawings." Jacobowitz's own testimony bears this out. He testified that it was his intention that the $16,790 represented moneys coming out of profits and pursuant to this reported it as ordinary income in his 1957 return. The option letter prepared by Jacobowitz also indicates that this amount was intended to be a charge against profits; it stated, in part: "Pending final settlement, you [Jacobowitz] will continue to draw $225.00 per week. If we consummate the agreement, you [Jacobowitz] relinquish all rights to profits and drawings from March 1, 1957, except those you have already received."

We are satisfied that the $16,790 reflects Jacobowitz's share of Abbey profits for the period March 1, 1957, to May 21, 1957, and was ordinary income to him for his taxable year ending December 31, 1957; Foxman and Grenell are entitled to have Abbey's income for the year ending February 28, 1958, reduced by that amount in computing their respective shares of Abbey profits for that fiscal year.[18]

---

[16] Abbey had earnings, before partners' salaries in the amounts of $39,807.43, $38,164.32, and $27,478.26 for the months of March, April, and May 1957, respectively.

[17] SEC. 706. TAXABLE YEARS OF PARTNER AND PARTNERSHIP.

(c) CLOSING OF PARTNERSHIP YEAR.—

(1) GENERAL RULE.—Except in the case of a termination of a partnership and except as provided in paragraph (2) of this subsection, the taxable year of a partnership shall not close as the result of the death of a partner, the entry of a new partner, the liquidation of a partner's interest in the partnership, or the sale or exchange of a partner's interest in the partnership.

(2) PARTNER WHO RETIRES OR SELLS INTEREST IN PARTNERSHIP.—

(A) DISPOSITION OF ENTIRE INTEREST.—The taxable year of a partnership shall close—

(i) with respect to a partner who sells or exchanges his entire interest in a partnership, and

(ii) with respect to a partner whose interest is liquidated, except that the taxable year of a partnership with respect to a partner who dies shall not close prior to the end of the partnership's taxable year.

Such partner's distributive share of items described in section 702(a) for such year shall be determined, under regulations prescribed by the Secretary or his delegate, for the period ending with such sale, exchange, or liquidation.

See Income Tax Regs., sec. 1.706–1(c)(2).

[18] A superficially similar situation was present in *Ray H. Schulz*, 34 T.C. 235, 250, 251, affirmed 294 F. 2d 52 (C.A. 9), where, however, the problem arose under the 1939 Code and where the facts were critically different. There, we regarded the retiring partner's membership in the firm as having in fact terminated at the close of the prior fiscal year. He did not in fact participate in the operation of the partnership nor was he entitled to share in its profits after that date. Here, there can be no question as to Jacobowitz's status as a full partner until May 21, 1957.

3. *Whether Abbey "terminated" on June 2, 1958.*—By amendments to the Commissioner's pleadings a number of additional issues are raised, all of them depending in the first instance upon a new major issue as to whether Abbey "terminated" on June 2, 1958, within the meaning of section 708.[19] These new matters do not involve Jacobowitz; they relate solely to Foxman's and Grenell's cases.

Abbey was on a fiscal year ending February 28, and Foxman and Grenell each reported in his 1958 return his distributive share of Abbey's income for its fiscal year ending February 28, 1958, as reflected in the partnership return for that fiscal year. The first two issues in these cases, dealt with above, relate to a revision of Abbey's reportable income and the distributive shares of the partners for Abbey's fiscal year ending February 28, 1958. The third issue, now under consideration, relates to Abbey's income realized *after* February 28, 1958. A "final" return was filed on Abbey's behalf purportedly for the fiscal year ending February 28, 1959, and Foxman and Grenell reported in their own returns for the calendar year 1959 their respective distributive shares of the income shown on that partnership return. The Commissioner, on the other hand, has taken the position in his amended pleadings that Abbey "terminated" on June 2, 1958, with the consequence that Foxman and Grenell were charged in 1958 with their distributive shares of Abbey's income for the short taxable year March 1, 1958, to June 2, 1958, in addition to their distributive shares for the full fiscal year ending February 28, 1958. Important subsidiary issues are also raised in this respect by the Commissioner involving the determination of the partnership's income for that short period. These subsidiary issues include the question whether the transfer of Abbey's assets to the corporation was nonrecognizable under section 351, the amount of gain realized if the transfer were recognizable, the amount of partnership income otherwise realized by Abbey during the period March 1–June 2, 1958, which in turn depends in part upon a proposed revision by the Commissioner of the depreciation allowance claimed on Abbey's behalf. We hold that Abbey did not terminate on June 2, 1958, as urged by the Commissioner. The subsidiary issues in this connection therefore become moot.

Upon consummation of the so-called Gittlin transaction on June 2, 1958, all of Abbey's assets had been transferred to the corporation,

---

[19] SEC. 708. CONTINUATION OF PARTNERSHIP.

(a) GENERAL RULE.—For purposes of this subchapter, an existing partnership shall be considered as continuing if it is not terminated.

(b) TERMINATION.—

(1) GENERAL RULE.—For purposes of subsection (a), a partnership shall be considered as terminated only if—

(A) no part of any business, financial operation, or venture of the partnership continues to be carried on by any of its partners in a partnership, or

(B) within a 12-month period there is a sale or exchange of 50 percent or more of the total interest in partnership capital and profits.

and the stock and debentures allocable to Abbey had been distributed to Foxman and Grenell. Also, the first of the three $100,000 Gittlin notes had been discounted and the proceeds distributed to Foxman and Grenell. Nevertheless, Foxman and Grenell promptly redeposited an aggregate of $20,000 of such proceeds to their capital accounts in Abbey, and Abbey continued to own the two remaining $100,000 Gittlin notes, one due on September 2, 1958, and the other on January 15, 1959. Moreover, there were still outstanding the two Jasie notes in the amounts of $5,000 each, due July 1, 1959, and January 2, 1960. The evidence further shows that in an effort to prevent the termination of Abbey, Foxman and Grenell began looking for income-producing property prior to June 2, 1958, to be purchased in behalf of Abbey. Two such items were in fact purchased by Abbey, a mortgage in July and rental property in September of 1958. While it is true that these items were of comparatively minor character in contrast to the enterprise previously carried on by Abbey, the fact that they were actually acquired by Abbey cannot be ignored. Abbey did receive interest on the Gittlin notes after June 2, 1958, as well as interest on the mortgage and rents from the real estate. It continued to be liable on the Jasie notes. Its affairs were not wound up on June 2, 1958. Cf. Income Tax Regs., sec. 1.708–1(b) (1) (iii). The situation is similar to that in *Emmette L. Barran*, 39 T.C. 515. The Commissioner attempts to distinguish *Barran* on the ground that a comparatively minor piece of real estate was not included among the assets that the partnership transferred to the new owner in that case. We think that, notwithstanding this circumstance and notwithstanding the different manner in which *Barran* arose, the cases are not fairly distinguishable. The Court in *Barran* could not find that the partnership had terminated under any part of section 708. We reached the same result. We hold that the Commissioner has failed to establish that Abbey "terminated" on June 2, 1958. Accordingly, the various proposed adjustments based upon such alleged termination cannot be approved.

*Decisions will be entered under Rule 50.*