William T. Wheeling and Antonette L. Wheeling v. Commissioner.
Wheeling v. Commissioner
Docket No. 3468-62.
United States Tax Court
T.C. Memo 1964-128; 1964 Tax Ct. Memo LEXIS 206; 23 T.C.M. (CCH) 778; T.C.M. (RIA) 64128; May 7, 1964
Charles J. Higson, for the petitioners. Michael P. McLeod, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: The Commissioner determined deficiencies of $931.12 and $588.25, respectively, in petitioners' income tax for the calendar years 1958 and 1959. The sole issue remaining for decision is whether William T. Wheeling correctly reported certain amounts received by him as long-term capital gains arising from the sale of a partnership interest pursuant to section 741 [1] or whether these amounts represented his distributive share of partnership income taxable as ordinary income under *208 section 736(a). All other issues raised by the pleadings have been settled by agreement between the parties. Findings of Fact Some of the facts have been stipulated, and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. William T. Wheeling (hereinafter referred to as petitioner) and Antonette L. Wheeling are husband and wife and filed their joint income tax returns for the calendar years 1958 and 1959 with the district director of internal revenue at Los Angeles, California. Petitioner has been a certified public accountant since 1946 and a public accountant since 1928. He engaged in the practice of public accounting in the Los Angeles area as a sole proprietorship from 1928 until sometime in the latter part of 1953. During 1953 petitioner, who was then 62 years of age, began to consider the possibilities of retirement. In connection therewith be ran an advertisement in a local professional journal indicating that he was interested in combining his practice with that of a younger accountant so that *209 he could eventually dispose of it. At that time petitioner had approximately 100 clients, 60 to 75 of which had been with him for over 20 years. In response to his advertisement petitioner was contacted by John W. Sunderman (hereinafter referred to as Sunderman) who was also an accountant with a substantial practice in the Los Angeles area. Sunderman was interested in combining his practice with that of petitioner's for the principal purpose of increasing the volume of his operations and obtaining petitioner's clients upon petitioner's retirement. Sunderman had an associate named Stanley L. Miller (hereinafter referred to as Miller). After some preliminary negotiations between these three individuals, they decided to combine their practices by entering into a partnership. As a fundamental condition to the formation of the partnership, it was agreed that petitioner would terminate his association with the partnership after a relatively short period of time and that he would be paid for his practice. It was further agreed that the amount petitioner would receive for his partnership interest would be determined by reference to a percentage of the gross fees received by Sunderman and *210 Miller from petitioner's former clients during the three years following petitioner's retirement. There was some disagreement between petitioner and Sunderman as to the exact percentage that would be used in determining the amount to be paid to petitioner. Nevertheless, petitioner, Sunderman and Miller commenced their partnership on November 1, 1953, pursuant to an oral agreement, despite the fact that they had not agreed upon the specific amount petitioner would receive upon his withdrawal from the firm. On October 28, 1954, when these three individuals had finally resolved this dispute and the press of their accounting work permitted them to do so, they entered into a written partnership agreement which was made retroactive to November 1, 1953. The partnership agreement provided initially that the partnership would be known as Sunderman, Wheeling and Co., and that after specified monthly salaries, Sunderman and Miller would receive 85 percent of the partnership profits and petitioner would receive 15 percent. By amendment dated December 2, 1955, petitioner's interest was increased to 20 percent. Paragraph 10 of the partnership agreement set forth the terms and conditions for the *211 sale of petitioner's partnership interest. It provided as follows: 10. On August 31, 1956, WHEELING agrees to retire from the partnership and sell his interest therein to SUNDERMAN and MILLER upon the terms hereinafter set forth, and SUNDERMAN and MILLER jointly and severally agree to purchase on August 31, 1956, the interest of WHEELING upon the terms hereinafter set forth. It is the intention of SUNDERMAN and MILLER to continue as partners after August 31, 1956, upon the terms and conditions herein set forth until such time as one of them retires or dies or terminates the partnership upon reasonable notice to the other. Reasonable notice shall be a minimum of sixty (60) days. None of the partners shall have the right to terminate the partnership prior to August 31, 1956. The terms of the purchase and sale to take place on August 31, 1956 are as follows: Of the gross fees billed Wheeling's clients for each of the three year periods beginning September 1, 1956, Wheeling is to receive 25% thereof payable quarterly as collected e.g., $20,000 fees billed the first year Wheeling is to receive $5,000; 2nd year gross fees billed $22,000 Wheeling is to receive $5,500; 3rd year gross fees *212 billed $24,000 Wheeling is to receive $6,000; Sunderman and Miller must purchase accounts that, for the six month period from March 1, 1956 to August 31, 1956, have been billed to clients at $5.00 or more per hour. On February 28, 1956, or as soon after as is practicable, Wheeling's accounts are to be reviewed. Sunderman and Miller are to then advise Wheeling which accounts that are yielding less than a $5.00 per hour charge to client they do not wish to purchase at above figure of 25% per year for three years. Wheeling may then offer these accounts for sale to any other accountants. Sunderman and Miller are to have right of first refusal at highest price offered. During the life of this contract Sunderman and Miller, and each of them, will at all times exercise due care and caution in the integration of Wheeling's practice with their own to see that harmonious relations are maintained with Wheeling's clients and to insure Wheeling of their agreement and their best efforts to keep Wheeling's clients, purchased by them, satisfied with their services and to do everything possible to insure collection of accounts. * * *
In the event of a breach of this contract the partner *213 or partners in default shall be liable, in addition to any and all damages and liabilities legally collectible or enforceable, for court costs and reasonable attorneys' fees incurred by the aggrieved party. As aforesaid, the liability to purchase the interest of Wheeling on August 31, 1956 shall be joint and several. Wheeling agrees that on and after August 31, 1956 he will not compete with Sunderman and Miller in the County of Los Angeles, State of California, so long as this contract is not in default. The moneys collected from Wheeling's clients beginning September 1, 1956, to the extent of the percentage thereof payable to Wheeling, shall be deemed to be held by the purchasers for the benefit of Wheeling. Complete records shall be kept with respect to all matters in connection with this agreement and Wheeling and/or his appointed representative shall have the right at all reasonable times to inspect and copy any or all of said records. A subsequent portion of the partnership agreement dealt with the division of partnership profits and capital upon the retirement or death of any partner or the termination of the partnership. It provided as follows: 12. On the retirement of *214 Wheeling on August 31, 1956 and/or upon any termination of the partnership or upon the death or withdrawal of any partner then, in addition to the other divisions or payments provided for herein, all uncollected charges for services rendered by the partnership shall be tabulated and each partner given credit for his share of the profits thereon. A copy of this tabulation shall be furnished each partner. Such share of the profits shall be payable as and when collected from each of the clients. Any and all accumulated profits which have not been added to the capital account shall be divided among the partners according to the division provided in this agreement. The capital account represented by cash invested or office furniture and equipment invested and/or profits added thereto shall be payable within thirty (30) days according to the proportions of the capital contributions of the partners. Because the operation of the partnership, as thus constituted, proved successful, it was decided that the date upon which petitioner was required to withdraw from the partnership, August 31, 1956, would be postponed. Therefore, by instrument dated December 2, 1955, the partnership agreement *215 was amended so that petitioner would not have to sever his connection with the partnership until August 31, 1957. In February 1957, the partners, pursuant to the terms of the partnership agreement, prepared two schedules, one setting forth all of the clients petitioner had brought to the partnership and the other setting forth a portion of these clients (essentially, but not exclusively, those which fees averaged less than $5.00 per hour) which were to be retained by petitioner upon his withdrawal. The purpose of these schedules was to record specifically the accounts with regard to which the amounts payable to petitioner would be determined. During the period petitioner was a member of the partnership, he used his best efforts to introduce his clients to Sunderman and Miller. As of August 1957, all of the accounts which were to be transferred to Sunderman and Miller were being serviced by them and had been so serviced for the preceding six months. On August 31, 1957, petitioner severed his association with Sunderman, Wheeling and Co. He took his files and working papers relating only to the clients he was to retain after that date. He left the files and working papers relating *216 to his former clients with Sunderman and Miller. On September 20, 1957, petitioner, Sunderman and Miller entered into an agreement (hereinafter referred to as the settlement agreement) which was in the nature of a settlement of the partnership accounts up to and including August 31, 1957. Essentially, the agreement provided for the payment to petitioner of his share of the partnership capital and the uncollected fees of the firm as of the date of petitioner's withdrawal. More specifically, the settlement agreement, in pertinent part, provided: 2. The capital account of William T. Wheeling, as evidenced by the attached Exhibit "A", is in the sum of $4241.93. Concurrently herewith J. Wm. Sunderman and Stanley L. Miller shall pay said sum to William T. Wheeling whose execution hereof shall acknowledge receipt of said sum. 3. Each party hereto has received a list of accounts receivable due to Sunderman, Miller and Wheeling as of August 31, 1957, and aggregating $16,307.64. Under the terms of the agreement between the parties William T. Wheeling is entitled to receive twenty percent (20%) of all monies collected from the clients designated on said list of accounts receivable. J. Wm. *217 Sunderman and Stanley L. Miller agree to pay to William T. Wheeling a sum equal to twenty percent (20%) of all sums hereafter collected in connection with the aforementioned accounts receivable. Payment shall be made to William T. Wheeling on the 10th day of each month hereafter commencing October 10, 1957, and continuing for so long as payments continue to be received in connection with said accounts. Each payment shall cover the period of the immediately preceding calendar month. Each payment shall be accompanied by a brief statement setting forth the names of the clients and the amount of payment received from such clients during the calendar month in question. The settlement agreement concluded with the following paragraphs: 4. The parties hereby ratify all of the provisions of the agreement of October 28, 1954, and the supplements and amendments of December 2, 1955, and February 2, 1957. The partnership heretofore existing between the parties by reason of said agreements is dissolved as of August 31, 1957. 5. This agreement shall be binding upon the parties, their respective heirs, executors and assigns. The schedule attached to the settlement agreement showed that petitioner *218 was entitled to 20 percent of the partnership profits up to and including August 31, 1957, or $7,851.23, of which $3,261.53 represented accounts receivable not yet collected as of that date. Petitioner was paid in cash for his share of the partnership capital and his share of the partnership profits which had been collected. Subsequently, he received 20 percent of amounts collected upon the firm's accounts receivable owed as of August 31, 1957. Petitioner reported his share of the firm's profits, including the receivables, as ordinary income. Upon petitioner's withdrawal from the partnership, Sunderman and Miller continued as partners pursuant to the provisions of the partnership agreement of October 28, 1954. Pursuant to the terms of the partnership agreement, the petitioner received for his partnership interest $4,593.88 in 1958 and $5,132.65 in 1959, which amounts were determined with reference to a percentage of the gross fees billed to petitioner's former clients. In 1958 Sunderman and Miller furnished petitioner with a Form 1099 indicating that the $4,593.88 received by him in 1958 constituted a "Payment on purchase of practice." That portion of the gross fees billed to petitioner's *219 former clients, payable to petitioner, was credited to the gross income. Then, when paid to petitioner, it was debited directly against the firm's gross income. Thus, these amounts were never included in the taxable income of the partnership at the end of its taxable year. Respondent, in his notice of deficiency, determined that the $4,593.88 and $5,132.65 reported by petitioner as long-term capital gains for the years 1958 and 1959 actually should have been included in petitioner's income in full as his share of partnership income. Opinion On August 31, 1957, petitioner's association with the partnership came to an end. Petitioner contends that he sold his partnership interest to Sunderman and Miller pursuant to section 741 and realized long-term capital gain in connection therewith. [2] In the alternative, petitioner argues that, in essence, what actually occurred was that he sold the goodwill of his accounting practice to Sunderman and Miller; that the partnership was merely a temporary conduit to facilitate the transfer of petitioner's accounting practice to Sunderman and Miller; that the partnership was liquidated on August 31, 1957; and that the sale of the goodwill attaching *220 to his accounting practice had nothing to do with the termination of the partnership. Respondent, on the other hand, contends that all the amounts received by petitioner were paid by the partnership in liquidation of petitioner's interest therein pursuant to section 736. [3] Respondent, furthermore, maintains that the $4,593.88 and $5,132.65 received by petitioner during 1958 and 1959 were in liquidation of his goodwill in the partnership, and since the partnership agreement did not specifically provide for a payment with respect to goodwill, these amounts constitute petitioner's distributive share of partnership income under section 736(a). *221 It is clear that a partnership interest may be sold to one or more members of the partnership. David A. Foxman, 41 T.C. 535 (1964). Respondent's regulations specifically cover this point. Thus, section 1.741-1(b) of the Income Tax Regulations provides: Section 741 shall apply whether the partnership interest is sold to one or more members of the partnership or to one or more persons who are not members of the partnership. * * * In such instances, the provisions of section 736 relating to the liquidation of a partnership interest are not applicable. See section 1.736-1(a)(1)(i) of the Income Tax Regulations: Sec. 1.736-1 Payments to a retiring partner or a deceased partner's successor in interest. (a) Payments considered as distributive share or guaranteed payment. (1)(i) Section 736 and this section apply only to payments made to a retiring partner or to a deceased partner's successor in interest in liquidation of such partner's entire interest in the partnership. See section 761(d). * * * Section 736 and this section apply only to payments made by the partnership and not to transactions between the partners. *222 Thus, a sale by partner A to partner B of his entire one-fourth interest in partnership ABCD would not come within the scope of section 736. The fundamental question for decision, therefore, is whether petitioner sold his partnership interest to Sunderman and Miller as individuals or whether the arrangement was merely that the surviving partnership of Sunderman and Miller would "buy out" petitioner's interest therein. As this Court has recently noted, the real controversy, in situations similar to the one now before us, is between the withdrawing partner and the remaining partners. [4]David A. Foxman, supra. See also Karan v. Commissioner, 319 F. 2d 303 (C.A. 7, 1963), affirming a Memorandum Opinion of this Court; V. Zay Smith, 37 T.C. 1033 (1962), affd. 313 F. 2d 16 (C.A. 10, 1962); and Jackson Investment Company, 41 T.C. - (February 26, 1964). Congress, in enacting sections 736 and 741, intended to permit partners to control the tax results, inter sese, upon the withdrawal of a partner. Because of this policy, we must carefully examine the arrangements which the partners have made among themselves. Since the practical differences *223 between (1) a sale of a partnership interest and (2) a liquidation by the partnership of such interest are slight, if such differences exist at all, the resolution of this issue often turns upon the specific wording of the partnership agreement and the rights and liabilities created thereby. An examination of the various instruments involved herein, as well as of the other relevant evidence in the record, leads us to *224 conclude that petitioner sold his interest in the partnership to Sunderman and Miller, as individuals. The partnership agreement of October 28, 1954, indicates the petitioner intended to sell his partnership interest, and Sunderman and Miller intended to purchase it. Thus, the agreement, in paragraph 10 thereof, provides that [PETITIONER] agrees to retire from the partnership and sell his interest therein to SUNDERMAN and MILLER upon the terms hereinafter set forth, and SUNDERMAN and MILLER jointly and serverally agree to purchase * * * the interest of [PETITIONER] * * *. After setting forth the purchase price for petitioner's partnership interest, namely 25 percent of the gross fees billed petitioner's former clients during the three years subsequent to petitioner's withdrawal, the partnership agreement again provides: As aforesaid, the liability to purchase the interest of [petitioner] * * * shall be joint and several. * * * The partnership formed by petitioner, Sunderman and Miller was formed in California and engaged in business in that State. Therefore, it is subject to the laws of California. Under California law, the liability of a partner is joint and several *225 only for the wrongs or torts committed by a partner (Cal. Corp. Code, § 15013) or the misapplication by a partner of money or property of a third party (Cal. Corp. Code § 15014). For all other partnership liabilities their obligation is merely joint. See section 15015, Cal. Corp. Code. [5] Therefore, it is clear that the obligation to purchase petitioner's partnership interest was an individual obligation of both Sunderman and Miller. We find nothing in any of the instruments relating to the arrangements between petitioner and Sunderman and Miller nor anywhere else in the record that is inconsistent with our conclusion that petitioner's interest in the partnership was sold to Sunderman and Miller as individuals. The fact that the purchase price for petitioner's interest was to be determined on the basis of a percentage of the gross *226 fees charged petitioner's former clients does not alter this conclusion. For this merely amounted to a method for valuing petitioner's partnership interest. In no way does it detract from the fact that Sunderman and Miller were each individually obligated to pay petitioner, for his partnership interest, an amount equal to 25 percent of the gross fees billed petitioner's former clients for the three-year period beginning upon petitioner's withdrawal from the firm. [6]
Moreover, there is nothing in the settlement agreement of September 20, 1957, which is inconsistent with our conclusion. The settlement agreement merely ratifies all of the provisions of the partnership agreement, as amended, and more specifically implements *227 the provisions thereof concerning the payment to petitioner of his share of the partnership capital and earned profits, including accounts receivable for fees earned, but uncollected as of August 31, 1957. In fact, if anything, the particular language of the settlement agreement suggests that Sunderman and Miller are individually obligating themselves to make the payments therein described. Thus, in pertinent part, the settlement agreement provides: 2. The capital account of [petitioner] * * * is in the sum of $4241.93. Concurrently herewith J. Wm. Sunderman and Stanley L. Miller shall pay said sum to [petitioner] whose execution hereof shall acknowledge receipt of said sum. 3. Each party hereto has received a list of accounts receivable as of August 31, 1957, and aggregating $16,307.64. Under the terms of the agreement between the parties [petitioner] is entitled to receive twenty percent (20%) of all monies collected from the clients designated on said list of accounts receivable. J. Wm. Sunderman and Stanley L. Miller agree to pay to [petitioner] a sum equal to twenty percent (20%) of all sums hereafter collected in connection with the aforementioned accounts receivable. *228 * * * [7]
The fact that petitioner was paid for his interest in the partnership with a check drawn on the account of the remaining partnership can in no way alter the liabilities of the individuals, Sunderman and Miller, arising from the partnership agreement, as amended. Nor can the individual liabilities of these two individuals be altered by the bookkeeping transactions employed by their partnership to reflect the amounts paid to petitioner. For if the partnership of Sunderman and Miller had not paid these amounts to petitioner, Sunderman and Miller, each, would have been individually liable to pay the full amount. On the basis of the evidence before us, it is our conclusion that the transaction before us falls within the language of section 741. Karan v. Commissioner, supra.Moreover, it is also our opinion *229 that it comes within the purpose of section 741. It is not a mere device to convert ordinary income to capital gains. Cf. Roth v. Commissioner, 321 F. 2d 607 (C.A. 9, 1963), affirming 38 T.C. 171 (1962). The sale of an accounting practice has upon numerous occasions been held to constitute the sale of a capital asset. Rodney B. Horton, 13 T.C. 143 (1949); Richard S. Wyler, 14 T.C. 1251 (1950); and Malcolm J. Watson, 35 T.C. 203 (1960). In view of our decision as to petitioner's first contention, it is not necessary for us to consider his alternative argument. Decision will be entered under Rule 50. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended.↩
2. SEC. 741. RECOGNITION AND CHARACTER OF GAIN OR LOSS ON SALE OR EXCHANGE. In the case of a sale or exchange of an interest in a partnership, gain or loss shall be recognized to the transferor partner. Such gain or loss shall be considered as gain or loss from the sale or exchange of a capital asset, except as otherwise provided in section 751 (relating to unrealized receivables and inventory items which have appreciated substantially in value.) ↩
3. SEC. 736. PAYMENTS TO A RETIRING PARTNER OR A DECEASED PARTNER'S SUCCESSOR IN INTEREST. (a) Payments Considered as Distributive Share or Guaranteed Payment. - Payments made in liquidation of the interest of a retiring partner or a deceased partner shall, except as provided in subsection (b), be considered - (1) as a distributive share to the recipient of partnership income if the amount thereof is determined with regard to the income of the partnership, or (2) as a guaranteed payment described in section 707(c) if the amount thereof is determined without regard to the income of the partnership. (b) Payments for Interest in Partnership. - (1) General Rule. - Payments made in liquidation of the interest of a retiring partner or a deceased partner shall, to the extent such payments (other than payments described in paragraph (2)) are determined, under regulations prescribed by the Secretary or his delegate, to be made in exchange for the interest of such partner in partnership property, be considered as a distribution by the partnership and not as a distributive share or guaranteed payment under subsection (a). (2) Special Rules. - For purposes of this subsection, payments in exchange for an interest in partnership property shall not include amounts paid for - (A) unrealized receivables of the partnership (as defined in section 751(c)), or (B) good will of the partnership, except to the extent that the partnership agreement provides for a payment with respect to good will.↩
4. If the transaction is found to be a sale, any gain reported by the withdrawing partner would be taxable as a capital gain (in the event none of the gain was attributable to unrealized receivables or substantially appreciated inventory as defined in section 751). If the transaction was found to constitute a liquidation pursuant to section 736, the amounts received by the withdrawing partner (to the extent they are not received in exchange for his partnership property pursuant to section 736(b)(1)) would constitute ordinary income. Moreover, to the extent the amounts received by the withdrawing partner are treated as payments pursuant to section 736(a), such amounts would not be included in the distributive share of partnership income of the remaining partners.↩
5. § 15015. Joint and several liability of partners. All partners are liable (a) Jointly and severally for everything chargeable to the partnership under Sections 15013 and 15014. (b) Jointly for all other debts and obligations of the partnership; but any partner may enter into a separate obligation to perform a partnership contract. * * *↩
6. The fact that the amount payable to petitioner is determined by reference to the fees paid by merely a portion of petitioner's former clients is not inconsistent with our conclusion that petitioner sold his entire partnership interest to Sunderman and Miller. The consideration for the remaining portion of petitioner's partnership agreement could be regarded as the relinquishment by Sunderman and Miller of whatever rights they had in petitioner's remaining clients.↩
7. Petitioner reported his share of the partnership accounts receivable as ordinary income when received by him. This fact is consistent with our determination that sec. 741 is applicable to the disposition of petitioner's partnership interest; for the amounts collected upon the receivables would appear to be taxable as ordinary income under sec. 751.↩