Harold P. and Susan H. Whitmore, et al. [1] v. Commissioner. Whitmore v. Commissioner
Docket Nos. 90977-8-9.
United States Tax Court
T.C. Memo 1965-121; 1965 Tax Ct. Memo LEXIS 209; 24 T.C.M. (CCH) 633; T.C.M. (RIA) 65121; May 5, 1965
*209 Payments received pursuant to agreements relating to Listerine and other discoveries made by petitioners' great-grandfather held taxable as ordinary income, since all substantial rights were not transferred. Payments received from a partnership of which petitioners' great-grandfather was a member held taxable as ordinary income, due to petitioners' failure of proof. Herrick K. Lidstone and William D. Kelly, for the petitioners. Robert D. Whoriskey, for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined deficiencies in petitioners' income taxes as follows: Year
Amount
Harold P. and Susan H. Whit-
more, Docket No. 90977
1955
$ 29,600.70
1956
40,421.33
1957
70,698.27
Minnie H. Miller (formerly
Minnie H. Gilbert), Docket
No. 90978
1954
87,971.12
1955
126,833.86
1956
109,927.80
1957
145,784.19
John J. and Josephine H.
Graeber, Docket No. 90979
1954
53,057.24
1955
84,652.79
1956
76,026.41
1957
96,658.45 The issues for decision are: (1) Whether certain payments received under agreements relating to Listerine and other discoveries of petitioners' great-grandfather are taxable as capital gain or as ordinary income; and (2) Whether certain other payments received from a partnership *210 of which the petitioners' great-grandfather was a member were in exchange for his partnership interest so as to be taxable as capital gain or are taxable at ordinary income rates. Some other items have been settled by stipulations and concessions and will be taken into account under Rule 50. Findings of Fact Many of the facts have been stipulated and are hereby incorporated herein by this reference. Petitioners Susan H. Whitmore (hereinafter sometimes referred to as "Susan") and Harold P. Whitmore reside in Greenwich, Connecticut. They filed cash basis joint Federal income tax returns for 1955 through 1957 with the district director of internal revenue for lower Manhattan. Petitioner Minnie H. Miller (formerly Minnie H. Gilbert and hereinafter sometimes referred to as "Minnie") resides in Greenwich, Connecticut. She filed cash basis Federal income tax returns for 1954 through 1957 with the district director of internal revenue for lower Manhattan. Petitioners Josephine H. Graeber (hereinafter sometimes referred to as "Josephine") and John J. Graeber reside in Los Angeles, California. They filed cash basis joint Federal income tax returns for 1954 through 1957 with the district director *211 of internal revenue for lower Manhattan. Susan, Minnie, and Josephine, hereinafter sometimes referred to as the petitioners, are the surviving daughters of Russell Hopkins and Vera Lawrence Hopkins. Their mother was the granddaughter of J. J. Lawrence (hereinafter sometimes referred to as "Lawrence"), a St. Louis, Missouri, physician. Lawrence devised the formulae and processes for medical preparations known as Iodia and Bromidia, which were manufactured and sold by Battle & Co., a partnership consisting of Lawrence, J. M. Battle, S. S. Blackwell, and C. A. Battle. On March 9, 1881, the four partners of Battle & Co. entered into an agreement (hereinafter sometimes referred to as the "Battle Contract") as follows: KNOW ALL MEN BY THESE PRESENTS, that the copartnership heretofore existing between J. M. Battle, S. S. Blackwell, C. A. Battle and J. J. Lawrence for the purpose of manufacturing medicines and running a medical journal called the Medical Brief is hereby dissolved by mutual consent, and the said J. M. Battle, S. S. Blackwell and C. A. Battle, who hereby agree to continue the business of the manufacture of medicines as equal partners under the name of Battle & Co., hereby also *212 agree to assume all debts and liabilities that have been or may be hereafter contracted to all persons whatsoever, and they further agree collectively and individually to release and do hereby release the said J. J. Lawrence from all debts and liabilities whatever that may have been or that hereafter may be contracted to all persons whatsoever, and the said J. M. Battle, S. S. Blackwell, and C. A. Battle hereby agree for themselves, their heirs executors and assignes in consideration of the fact, that the said J. J. Lawrence hereby relinquishes all his right, title and interest as partner in the business of manufacturing medicines by Battle & Co., to pay monthly to the said J. J. Lawrence, his heirs, executors and assigns, ten percent on the gross sales (less the freight) on Iodia, Bromidia, and all other medicines now manufactured and sold by them or that may hereafter be manufactured or sold by them, their heirs, executors, administrators or assigns, and as a further consideration they hereby agree for themselves, their heirs, executors and assigns to and hereby do release, resign, relinquish and forever quitclaim all their right, title and interest to and in the medical journal *213 called the Medical Brief to the said J. J. Lawrence, his heirs, executors and assigns, and they further agree to allow said J. J. Lawrence to examine books of said firm whenever he desires so to do. In testimony whereof they have this the 9th day of March, 1881, set their hand and seal. At some date after 1881, Lawrence devised the formulae and processes for medical preparations known as Celerina and Pinus Canadensis. On March 7, 1882, Joseph C. Richardson registered "Celerina" a trademark for a medicine, and on August 18, 1908, Rio Chemical Company (hereinafter sometimes referred to as "Rio") registered "Pinus Canadensis" a trademark for a medicine. On January 17, 1884, Joseph C. Richardson, as Rio's president, executed an instrument (hereinafter sometimes referred to as the "Rio Contract") which provides as follows: KNOW ALL MEN BY THESE PRESENTS, that for and in consideration of the fact that [Lawrence] * * * has furnished [Rio] * * * with several valuable processes and formulas for the manufacture of goods, [Rio] * * * hereby agrees and contracts for itself and its assigns to pay to [Lawrence] * * *, his heirs, executors and assigns, ten (10) per cent on the gross amount of sales *214 of Celerina, Pinus Canadensis and all other goods which [Rio] * * * or its assigns may hereafter manufacture or sell - account of sales to be rendered, and payment of said royalty to be made on the 10th day of each month. - In testimony whereof it hereunto sets its hand and seal - Done at St. Louis, Mo. this the 17th day of January, 1884. Rio's payments to petitioners involved in the present cases were received pursuant to the terms of the Rio Contract. In or about 1880 Lawrence invented the formula and processes for manufacturing an antiseptic liquid compound known as "Listerine." Prior to April 20, 1881, Lawrence delivered to Jordan W. Lambert (hereinafter sometimes referred to as "Lambert") a document in Lawrence's handwriting setting forth the Listerine formula and process. On April 20, 1881, Lambert executed and delivered to Lawrence a contract (hereinafter sometimes referred to as the "1881 Contract") which provides in entirety as follows: Know all men by these presents, that for and in consideration of the fact, that [Lawrence] * * * has furnished me with the formula of a medicine called Listerine to be manufactured by me, that I, [Lambert] * * *, hereby agree for myself, my *215 heirs, executors and assigns to pay monthly to [Lawrence] * * *, his heirs, executors or assigns, the sum of twenty dollars for each and every gross of said Listerine hereafter sold by myself, my heirs, executors, or assigns. In testimony whereof, I hereunto set my hand and seal, Done at St. Louis, Mo. this the 20th day of April 1881. Jordan W. Lambert (seal) The 1881 Contract was written on the stationery of The Medical Brief in Lawrence's handwriting, with the exception of an insert of "Jordan W. Lambert" in Lambert's signature. Thereafter, on May 1, 1881, Lambert began to manufacture and sell the liquid antiseptic in commercial quantities under the trade name "Listerine." On June 21, 1881, Lambert filed an application with the United States Patent Office for the registration of the name "Listerine" as a trademark. In a declaration submitted with this application, Lambert stated under oath that he had the right to use this name as a trademark and that "no other person, firm or corporation has the right to such use." On October 21, 1881, Lawrence sent Lambert the following letter: I hereby reduce my royalty on Listerine from twenty dollars [per] gross to twelve dollars [per] gross *216 on the condition that a statement of your sales made each preceding month be rendered to me promptly on or before the 10th of each month, and payment of the amount due me on said royalty be made to me or my heirs at the same time. I also hereby waive any demands of royalty on you preceding the 1st of October 1881 - On March 23, 1883, Lawrence sent Lambert the following letter: I hereby reduce my royalty on Listerine from ten [per] cent on gross amount of sales to six dollars [per] gross, the same reduction is hereby made on my royalty on Renalia. * * * On or about November 12, 1884, Lambert incorporated Lambert Pharmacal Company (hereinafter sometimes referred to as "Pharmacal") in Missouri to acquire and carry on the Listerine business. Lambert was elected president and a director of Pharmacal. At its November 15, 1884, meeting, Pharmacal's board of directors authorized Lambert and the secretary "to buy from Lambert & Co. rights and titles to the Medical preparations known as Listerine and Lithiated Hydrangea (Lambert)." At least three drafts of an agreement to be signed by Pharmacal were written in Lawrence's handwriting. The shortest draft recited that Lawrence had furnished to *217 the company "certain Pharmaceutical and other information of great value * * *" and that the company would pay a sum "on each & every gro. of the preparation now owned and manufactured by said - Pharm. Co. known as L. & L.H. * * *" and described such payment as "royalty." Another draft recited that Lawrence had "sold to [Lambert] * * * (constituting the firm Lambert & Co.) the formula & processes for the manufacture of two medicinal preparations known respectively as Listerine and Lithiated Hydrangea, with all the rights & benefits accruing therefrom, * * *" and that Lambert had "sold said formulae" to Pharmacal. It described as "royalty" the payment to be made to Lawrence on each gross of Listerine "manufactured & sold by [Phiarmacal] * * *." A third draft recited that Lawrence had "originated & heretofore sold to * * * [Lambert] the formulae and processes for the manufacture of two medicinal preparations known respectively as Listerine & Lithiated Hydrangea * * *" and that Lambert had "sold said formulae" to Pharmacal. It also described as "royalty" the payment to be made on each gross of Listerine "manufactured & [the '&' is struck out and replaced by 'or' in another handwriting] *218 sold by [Pharmacal] * * *." During the drafting of the November 15, 1884 Contract, Lambert wrote two letters to Lawrence relating to the preparation of the 1884 Contract, dated November 10, 1884, and November 11, 1884, respectively. The text of these letters is as follows: That you may have better opportunity to digest & avoid if possible much discussion at our final interview, I hand you my conception of what ought to be a mutually satisfactory royalty paper, being in my judgment a little more comprehensive than the one submitted by you. My idea is that the paper should show as far as possible the full relation of all parties so that at any future time, it will be found unnecessary to refer to previous arrangements. I wrote the agreement yesterday, intending to send it to your residence, but was prevented by company. I have made the change manufacture & sell not or sell - I do not think for the long future, we should be obligated to sell. You made the consideration information &c - you will see that I have endeavored to fix a more definite consideration - a legal paper is best to be plain. It is due you I call attention to these two radical changes - Shall expect you at 11:30. On *219 January 2, 1885, Lambert and J. R. Peacock, respectively president and secretary of Pharmacal, executed an instrument (hereinafter sometimes referred to as the "1885 Contract") as follows: [Lawrence] * * * having originated & heretofore sold to [Lambert] * * *, the formulae & processes for the manufacture of two medical preparations, known as * * * Listerine & Lithiated Hydrangea, with all the rights & benefits accruing therefrom and has received therefor a monthly royalty from [Lambert] * * *, and [Lambert] * * * having sold said formulae of Listerine & Lithiated Hydrangea to [Pharmacal] * * *, and furthermore * * * [Lawrence] having sold to [Pharmacal] * * * his sole & exclusive right to the formulae & processes originated by him for making two preparations called "Dugongol" & Menthated Camphor, therefore know all men by these presents that for & in consideration of these facts, * * * [Pharmacal] hereby agrees & contracts for itself & assigns to pay to * * * [Lawrence], his heirs, executors & assigns, six dollars on each & every gross of Listerine & Lithiated Hydrangea manufactured or sold by * * * [Pharmacal] or its assigns, and ten per cent (10%) on gross amount of sales of the *220 said Dugongol & Menthated Camphor, and all other goods which * * * [Pharmacal] or its assigns may hereafter manufacture or sell on formulae furnished by * * * [Lawrence], account of sales to be rendered & payment of said royalty to be made on the tenth day of each month. In testimony whereof * * * [Pharmacal] has caused these presents to be sealed with its corporate seal and signed by its President & Secretary this second day of January 1885. Pharmacal and its successors have continued to manufacture and sell Listerine and to make the contractual payments to Lawrence and his successors. After Lawrence delivered the Listerine formula and process to Lambert, and through the taxable years involved in these cases, Lambert and his successors treated the Listerine formulae and process as a trade secret. Only a few people in the top management of Pharmacal and its successors knew the formula or process. The personnel in manufacturing and in the laboratories were told only those portions that were necessary for them to fulfill their particular jobs. Prior to the disclosure of the formula in the course of the litigation reported in Warner-Lambert Pharm. Co. v. John J. Reynolds, Inc., 178 F. Supp. 655 *221 (S.D.N.Y., 1959), affd. per curiam 280 F. 2d 197 (C.A. 2, 1960), Lambert and his successors never published or revealed the formulae or the process. On March 1, 1909, Lawrence executed an indenture creating a revocable trust (hereinafter sometimes referred to as the "1909 Trust"). Under the terms of the 1909 Trust, Lawrence transferred to J. P. Dawson, as trustee: All my right, title and interest in, to and concerning the royalties and moneys due and to become due to me by Henry R. Strong, growing out of the purchase from me by said Strong of My Journal the "Medical Brief;" also, All my right, title and interest in, to and concerning the royalties and moneys due and to become due to me by [Pharmacal] on sales of Listerine and of other articles and preparations manufactured and sold by it; also All my right, title and interest in, to and concerning the royalties and moneys due and to become due to me by the Battle & Company Chemists Corporation, on the sales of Bromidia, Iodia and the other articles and preparations manufactured and sold by it; also, All my right, title and interest in, to and concerning the royalties and moneys due and to become due to me by * * * [Rio] on sales of *222 Celerina, Aletris Cordial and of other articles and preparations manufactured and sold by it. The income of the 1909 Trust was payable to Lawrence for life, then to his wife (Josephine Lawrence) for her life, and then to his granddaughter (Vera Lawrence Hopkins) for her life. Upon the death of the granddaughter, the corpus of the 1909 Trust was payable to such of her children as were then alive. Lawrence died testate on March 14, 1909; Josephine Lawrence died on January 10, 1921; and Vera Lawrence Hopkins died on February 16, 1928, survived by four children: John Randolph Hopkins, Josephine, Susan, and Minnie. At the time of their mother's death, all four children were under the age of 21. Upon the death of Lawrence's widow in 1921, the then trustee of the 1909 Trust was appointed and duly qualified as testamentary guardian of the minor children. Pursuant to a decree entered by the Circuit Court of the City of St. Louis in 1929, the trustee assigned and transferred to himself, as testamentary guardian of the minor children, the corpus of the 1909 Trust. After each of the four children became 21, the testamentary guardian delivered to them certain securities, cash, and an undivided *223 one-fourth interest in and to the contracts comprising a part of the corpus of the 1909 Trust. During the years 1955 through 1957, Susan received the following payments from Warner-Lambert Pharmaceutical Company, Inc. (hereinafter sometimes referred to as "Warner-Lambert"), the successor by merger to Pharmacal, Rio, and Battle & Co.: 1955
1956
1957
Warner-Lambert
$114,309.86
$126,138.45
$161,844.29
Rio
1,897.05
1,881.52
1,152.12
Battle & Co.
1,655.86
1,534.94
1,450.09
Canadian Bank of Commerce
0
0
4,363.64
Bank of Montreal
0
0
346.80
TOTALS
$117,862.77
$129,554.91
$169,156.94 During 1954 through 1957, Minnie received the following payments from Warner-Lambert, Rio, and Battle & Co. : 1954
1955
1956
1957
Warner-Lambert
$199,078.76
$219,474.95
$242,655.37
$319,786.20
Rio
1,897.58
1,896.95
1,636.90
1,152.15
Battle & Co.
1,385.57
1,655.86
1,534.94
1,450.09
TOTALS
$202,361.91
$223,027.76
$245,827.21
$322,388.44
During the years 1954 through 1957, Josephine received the following payments from Warner-Lambert, Rio, and Battle & Co.: 1954
1955
1956
1957
Warner-Lambert
$103,686.83
$114,309.86
$126,138.45
$161,844.29
Rio
1,897.65
1,897.05
1,881.52
1,152.12
Battle & Co.
1,894.14
1,655.86
1,534.94
1,450.09
Canadian Bank of Commerce
0
0
0
4,363.64
Bank of Montreal
0
0
0
346.80
TOTALS
$107,478.62
$117,862.77
$129,554.91
$169,156.94
*224 The 1957 payments to Susan and Josephine by the Canadian Bank of Commerce and the Bank of Montreal were made on behalf of Warner-Lambert. All three petitioners reported the above receipts for Federal income tax purposes as proceeds periodically received from the purchasers of capital assets. Opinion Issue 1 - Lambert Payments Petitioners maintain that the payments received pursuant to the 1881 and 1885 Contracts are taxable as long-term capital gains pursuant to the relevant provisions of section 1235. [2] *225 They read the section, as applied here, to require that the 1881 Contract constitute a transfer of all substantial rights to an invention which was patentable at the time of the transfer. Petitioners have introduced evidence from which they argue that the Listerine formula and process was patentable in 1881 and that the 1881 Contract transferred all substantial rights in that formula and process. Respondent disagrees with petitioners' reading of the section. He maintains, further, that the 1881 Contract constituted a license and not a sale. In addition, he argues that the Listerine formula and process was not patentable in 1881. We agree with respondent that the transaction did not constitute a transfer of all substantial rights to the Listerine formula and process. The cases and the statute have drawn a line between licenses and transfers. A transfer may be said to have resulted when *226 the transferor no longer may make, use, or sell the invention transferred while the transferee may now do all these things and may itself transfer to others the right to do any or all of these things. See e.g., Waterman v. Mackenzie, 138 U.S. 252 (1891); Rose Marie Reid, 26 T.C. 622 (1956); Lynne Gregg, 18 T.C. 291 (1952), affd. 203 F. 2d 954 (C.A. 3, 1953); William O'Neill Kronner and Lila A. Wemp, 126 Ct. Cl. 156, 110 F. Supp. 730 (1953). The 1881 Contract contained no language of sale; it did not by its terms forbid Lawrence to engage in any activity respecting Listerine that he could have engaged in before; it did not by its terms give Lambert the right to forbid others to make, use, or sell Listerine nor was he given the right, without Lawrence's concurrence, to sell to others the right to make, use, or sell Listerine; nor is there any evidence that the parties intended otherwise. The 1881 Contract describes as royalties the payments Lambert was to make to Lawrence. "Royalty" is a term more commonly associated with a license than with a transfer. The contract refers to Lambert's "assigns." That word could refer to Lambert's right to license or sell to others but it is equally *227 consistent with a reference to Lambert's right to assign his license under the contract. Later drafts, together with the 1885 Contract, do recite the existence of a sale by Lawrence to Lambert, but they also continue to use the term "royalty." Lambert's very desire to have Lawrence agree to the 1885 Contract strongly suggests his understanding that the 1881 Contract constituted a license and did not create an ownership interest in Lambert. Lambert's discussion of his proposed change from "manufacture or sell" to "manufacture and sell" (which change was apparently reversed in the 1885 Contract) also points to the existence of a license. If Lambert owned the right to manufacture and sell as a result of the 1881 Contract, then the exact language in Lambert's 1885 Contract transferring his rights to Pharmacal would be of no importance to Lawrence. Although the issue is by no means free from doubt, such evidence as we have predominates in favor of a conclusion that the 1881 Contract constituted a license. That agreement was discussed in John Randolph Hopkins, 15 T.C. 160 (1950), and in Josephine Hopkins Tucker, a Memorandum Opinion of this Court, dated September 18, 1942. We concluded *228 in both cases that the agreement constituted a license. To same effect, see also, Hopkins v. United States, 113 Ct. Cl. 217, 82 F. Supp. 1015 (1949). Under the principle of stare decisis, we accord these holdings substantial weight. Petitioners make much of the District Court's incidental use of "sale" at one point in its consideration of these contracts. Warner-Lambert Pharm. Co. v. John J. Reynolds, Inc., supra, at 658. However, the court was not there concerned with whether the transaction was a transfer or a license. Its task was merely to determine the chronological extent of the obligation assumed by Lambert, Pharmacal, and Warner-Lambert to pay Lawrence's heirs and assigns. Petitioners' alternate contention, that the 1881 Contract constituted a sale of a capital asset apart from section 1235, fails for the reasons assigned by us in the section 1235 discussion. John Randolph Hopkins, supra. On this issue we hold for respondent. Issue 2 - Rio Payments Petitioners' contentions and the facts regarding the payments received under the Rio Contract are similar to those we have rejected in the Listerine issue and they fail for the same reasons. John Randolph Hopkins, supra. *229 Issue 3 - Battle Payments Petitioners maintain that Lawrence sold his interest in the Battle & Co. partnership, that the interest was a capital asset held by him for more than six months, and that the payments received under the Battle Contract were received in exchange for his transfer of the partnership interest. Respondent replies that the evidence does not show whether the payments were for Lawrence's partnership interest or were royalties on sale of medicinal preparations formulated by Lawrence and manufactured and sold by the partnership. Respondent also insists that the evidence does not show Lawrence's holding period for his partnership interest. The only evidence on this issue is the Battle Contract itself. The contract clearly recites that the transfer of the Medical Brief and the payments relating to production of Iodia and Bromidia are in consideration of Lawrence's relinquishment of his interest in the partnership. The Battle Contract does not lend support to the argument that the payments are for a license to manufacture and sell those medical preparations. We may assume that the parties to this 1881 agreement were not affected in their choice of words by considerations *230 of Federal income taxation, since such taxes were repealed in 1872 and not re-enacted until 1894. Despite our inability to accept respondent's view of the Battle Contract, we are not persuaded that petitioners' view is the only, or even the most probable alternative. The tax consequences for the years before us are to be determined under the provisions of the Internal Revenue Code of 1954 despite the fact that the payments arose out of an agreement entered into in 1881. Zola Klein, 42 T.C. 1000 (1964). When a partnership has not been dissolved (cf. John Winthrop Wolcott, 39 T.C. 538 (1962)) the tax consequence to a partner on account of the disposition of his partnership interest is measured by section 736[3] *231 *232 (liquidation) or section 741 n4 (sale). If section 741 is applicable, then the receipts constitute capital gains except to the extent they are attributable to unrealized receivables or appreciated inventory as defined in section 751. We have no evidence directly relating to an apportionment of the price between section 751 items and the remainder of Lawrence's partnership interest. However, since the payments are based solely on sales of Iodia and Bromidia, it is unlikely that any of the current payments relate to section 751 items. See John Winthrop Wolcott, supra, at p. 546, and section 1.751-1(c)(ii), Income Tax Regs. We have no evidence as to Lawrence's holding period. Consequently, even if we concluded that section 741 applied, we could not determine whether the gain was long term or short term. If section 736 were applicable to these payments, then the payments would constitute ordinary income under subsection (a) *233 unless they were shown to be payments for partnership property under subsection (b). The Battle Contract measures the payments solely by the partnership's (or its successor's) income from sales of Iodia and Bromidia. We must conclude, in the absence of contrary evidence, that the payments would constitute ordinary income under section 736(a)(1). We have stated that the choice between sections 736 and 741 depends upon the source of the payments. V. Zay Smith, 37 T.C. 1033 (1962), affd. 313 F. 2d 16 (C.A. 10, 1962); Jackson Investment Co., 41 T.C. 675, 681 (1964), on appeal (C.A. 9, August 10, 1964); David A. Foxman, 41 T.C. 535, 551 (1964), on appeal (C.A. 3, August 6, 1964). Once again, no evidence bears directly upon the source of the funds used to make the payments or the intention of the parties to the Battle Contract. Speculation does not lead us to any conclusion as to the source of the payments. Thus petitioners have failed to show error in respondent's determination that the current receipts on account of the Battle Contract constitute ordinary income. Under these circumstances we must hold for respondent. Respondent has sought to rely upon our decision in Josephine Hopkins *234 Tucker, supra, and the agreement of the parties in Harold Payne Whitmore, B.T.A. Docket No. 106289, to collaterally estop petitioners here from denying those propositions which would lead to a holding for respondent in this proceeding. Petitioners have presented arguments intended to avoid application of the doctrine of collateral estoppel. Even under respondent's approach, only Josephine and Susan would be estopped. Minnie would be free to argue the same points her sisters had previously raised and lost. Consequently we have been required to consider all the arguments on their merits. Such consideration results in the same decision to be entered here as would follow from application of the doctrine of collateral estoppel. We see, then, no purpose to be served by determining whether collateral estoppel is properly applicable to any of the contentions of Josephine and Susan. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Minnie H. Miller (formerly Minnie H. Gilbert), Dkt. No. 90978 and John J. and Josephine H. Graeber, Dkt. No. 90979.↩
2. All statutory references are to the Internal Revenue Code of 1954 unless indicated otherwise. SEC. 1235. SALE OR EXCHANGE OF PATENTS. (a) General. - A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are - (1) payable periodically over a period generally coterminous with the transferee's use of the patent, or (2) contingent on the productivity, use, or disposition of the property transferred. * * *
(c) Effective Date. - This section shall be applicable with regard to any amounts received, or payments made, pursuant to a transfer described in subsection (a) in any taxable year to which this subtitle applies, regardless of the taxable year in which such transfer occurred.↩
3. SEC. 736. PAYMENTS TO A RETIRING PARTNER OR A DECEASED PARTNER'S SUCCESSOR IN INTEREST. (a) Payments Considered as Distributive Share or Guaranteed Payment. - Payments made in liquidation of the interest of a retiring partner or a deceased partner shall, except as provided in subsection (b), be considered - (1) as a distributive share to the recipient of partnership income if the amount thereof is determined with regard to the income of the partnership, or (2) as a guaranteed payment described in section 707(c) if the amount thereof is determined without regard to the income of the partnership. (b) Payments for Interest in Partnership. - (1) General rule. - Payments made in liquidation of the interest of a retiring partner or a deceased partner shall, to the extent such payments (other than payments described in paragraph (2)) are determined, under regulations prescribed by the Secretary or his delegate, to be made in exchange for the interest of such partner in partnership property, be considered as a distribution by the partnership and not as a distributive share or guaranteed payment under subsection (a). (2) Special rules. - For purposes of this subsection, payments in exchange for an interest in partnership property shall not include amounts paid for - (A) unrealized receivables of the partnership (as defined in section 751(c)), or (B) good will of the partnership, except to the extent that the partnership agreement provides for a payment with respect to good will. n4 SEC. 741. RECOGNITION AND CHARACTER OF GAIN OR LOSS ON SALE OR EXCHANGE. In the case of a sale or exchange of an interest in a partnership, gain or loss shall be recognized to the transferor partner. Such gain or loss shall be considered as gain or loss from the sale or exchange of a capital asset, except as otherwise provided in section 751↩ (relating to unrealized receivables and inventory items which have appreciated substantially in value).