JACKSON INVESTMENT COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

WEST SHORE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 94203, 94204.   Filed February 26, 1964.

*Ronald C. Roeschlaub*, for the petitioner in docket No. 94203.
*Austin H. Peck, Jr.*, for the petitioner in docket No. 94204.
*Paul G. Wilson*, for the respondent.

#### OPINION

FORRESTER, *Judge:* All of the facts have been stipulated and are so found.

Respondent has determined deficiencies in income taxes as follows:

|  | 1956 | 1957 | 1958 |
| --- | --- | --- | --- |
| Jackson Investment Co | $2,279.87 | $6,044.55 | $1,523.76 |
| West Shore Co | 5,809.15 | 5,833.20 | 3,935.50 |

The sole issue now remaining before us is whether certain payments made by Carter Company Contractors and Developers (a partnership formerly known as George W. Carter Co., and hereinafter sometimes referred to as Partnership) to a retiring partner, were properly deductible from the gross income of Partnership when said payments were made in 1956, 1957, and 1958.

On September 14, 1950, Jackson Investment Co., a California corporation, West Shore Co., a California corporation, and Ethel M. Carter, hereinafter sometimes called Ethel, executed written articles forming a limited partnership for the purpose of carrying on the construction business, including the purchase, development, and leasing or sale of realty, formerly conducted in partnership form by petitioners and Ethel's husband, who had recently died.

Said articles were silent as to the retirement of a partner, but provided, *inter alia*, that any partner had the right to cause the dissolution of Partnership by giving 30 days' written notice to the others, whereupon—

After the payment of then outstanding obligations of the partnership, the assets shall be used to pay the partners the then balances in their respective capital

accounts. Any remaining assets shall be distributed among the partners in accordance with the ratio for the sharing of partnership profits and losses * * *. In making distributions in winding up, assets may be distributed in kind. All assets shall be distributed at their then fair market value.

The articles made no reference to partnership goodwill and nowhere provided for any payment with respect thereto.

On May 7, 1956, Partnership, each of petitioners, and Ethel executed an agreement entitled "Amendment of Limited Partnership Agreement of George W. Carter Company." It recited that it was effective as of December 31, 1955, and under its terms Partnership paid Ethel a total of $60,000. The agreement allocated $20,550 of this amount to Ethel's 15-percent interest in the net assets of Partnership, and $39,450 to what was referred to in the agreement as "a guaranteed payment, or a payment for good will." By reason of a subsequent accounting adjustment, Ethel's 15-percent interest in the net assets of Partnership was decreased by $900 to $19,650, and the amount to be paid for what was referred to as "a guaranteed payment, or a payment for good will" was increased by $900. The $19,650 was treated on Partnership's books and records as a payment by Partnership for Ethel's interest in the net assets of Partnership. The $40,350 was paid to Ethel by Partnership during the calendar years and in the respective amounts indicated below:

| | |
|---|---:|
| 1956 | $16,680 |
| 1957 | 13,150 |
| 1958 | 10,520 |

These latter payments were determined without regard to the income of Partnership during the taxable years in which the respective amounts were paid. In accounting for said payments on the books of account of Partnership the bookkeeper described said payments in his journal entries as for goodwill. Said payments, totaling $40,350, were deducted by Partnership in determining its distributable net income for the respective taxable years in issue.

At the time that the above agreement was negotiated and executed the business of Partnership had goodwill, although no goodwill was carried on its books of account at that time or at any time thereafter.

Other relevant provisions of said agreement are as follows:

WHEREAS, the parties hereto now wish to amend said Limited Partnership Agreement, and to agree to amend said Certificate of Limited Partnership, to provide for the retirement of ETHEL M. CARTER as a partner in GEORGE W. CARTER COMPANY, as of December 31, 1955, upon the terms hereinafter expressed:

Now, THEREFORE, in consideration of the mutual agreements herein expressed, it is hereby agreed by the parties hereto as follows:

1. George W. Carter Company shall pay to Ethel M. Carter, as a retiring partner, and Ethel M. Carter shall accept from George W. Carter Company

the sum of Sixty Thousand Dollars ($60,000.00) to be paid in installments as hereinafter provided, in full liquidation, satisfaction and settlement of Ethel M. Carter's entire partnership interest in George W. Carter Company, and all of her interest in the property, business and good will of George W. Carter Company, and of all prior partnerships operated under the same name, and as consideration for Ethel M. Carter's not requiring a dissolution of the partnership in accordance with Paragraphs 9 and 10 of the said Limited Partnership Agreement dated September 14, 1950. Until the first day of January, 1962, the said Ethel M. Carter does hereby relinquish to the partnership, George W. Carter Company, and its successors and assigns, any and all rights which she may have to use the name George W. Carter Company, or any similar name, for the purpose of carrying on or conducting any kind of business whatsoever in any one or more of the states of California, Oregon, Washington, Nevada and Arizona; and the said Ethel M. Carter does hereby agree that she will not, either individually, or in conjunction or association with any other person, firm or corporation, for the purpose of carrying on or conducting any business in any of said states, use said name George W. Carter Company, or permit said name to be used or any name so similar thereto which may be confused with the name George W. Carter Company, prior to January 1, 1962. It is further agreed that the partnership, George W. Carter Company, shall have the right to continue the use of said name George W. Carter Company in conducting the said partnership business until January 1, 1962, and both now and thereafter the partnership shall have the right to use the name "Carter" in any business conducted by it, but shall not use in connection with the name "Carter" the name and initial "George W." after January 1, 1962.

Jackson Investment Company and West Shore Company acknowledge that they are aware of the fact that the said Ethel M. Carter owns all of the outstanding capital stock of George W. Carter Company, Inc., a California corporation, and the parties hereto agree that nothing herein contain shall prevent the said Ethel M. Carter from causing said corporation to continue to do business, but said corporation shall not do business under its said name prior to January 1, 1962, and Ethel M. Carter shall cause said corporation to adopt a fictitious name pursuant to the statutes of the State of California, which name shall in no way conflict with the partnership name George W. Carter Company.

Said Ethel M. Carter further agrees that if at any time during the term of this agreement she disposes of such number of shares of stock of said corporation as to cause her to lose control thereof, she will prior to the sale of said shares change the name of said corporation to a name other than George W. Carter Company.

Anything herein contained to the contrary notwithstanding, after the lapse of said pay-out period, January 1, 1962, or six (6) years, whichever is longer, the parties hereto agree that the said Ethel M. Carter shall have the unrestricted right to use the name George W. Carter Company, or a similar name, either individually or in conjunction or association with any other firm or corporation to carry on in any locality any business whatsoever; provided, however, that the said Ethel M. Carter agrees not to, either directly or indirectly, carry on any business under the name which is the same as the name being used by the partnership or any successor of the partnership, after the name "George W." has been dropped from the name George W. Carter Company as provided in this Paragraph 1.

2. It is agreed that Ethel M. Carter, through accountants of her own choice, has made an examination of the books, records and properties of George W. Carter Company, but has not made a detailed audit thereof, although the partner-

ship and the other partners authorized her to make such an audit, and based solely on such examinations, the said Ethel M. Carter has made her own determination (with competent professional advice) of the amount of the capital account of Ethel M. Carter as a partner in George W. Carter Company as of December 31, 1955, and of the amount and value of the property of George W. Carter Company as of December 31, 1955, as hereinafter expressed. It is agreed that the capital account of Ethel M. Carter as a partner in George W. Carter Company, as of December 31, 1955, is $18,301.36, and that the fair market value of Ethel M. Carter's fifteen per cent (15%) interest in all the net assets of the partnership is $20,550.00, as of December 31, 1955. The said sum of $60,000.00 to be paid by George W. Carter Company to Ethel M. Carter in installments as herein provided, and to be accepted by Ethel M. Carter as provided in Paragraph 1 hereinabove, has been determined and computed as follows:

Amount attributable to Ethel M. Carter's 15% interest in the fair market value of all the net assets of the partnership as of December 31, 1955_____ $20,550.00

Amount in addition thereto, as a guaranteed payment, or a payment, for good will_____ 39,450.00

Total_____ 60,000.00

It is recognized by all the parties hereto that the prior agreements among the partners do not provide for any payment to any partner in respect to good will in the event of the retirement or withdrawal of a partner, but George W. Carter Company will nevertheless make a payment to Ethel M. Carter in respect to good will as herein provided in consideration of her entering into this agreement and her consent to retire from the partnership upon the terms herein expressed.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

4. The said sum of $60,000.00 to be paid by George W. Carter Company to Ethel M. Carter, as hereinabove provided, shall be paid in installments as follows: * * *

5. All parties hereto do hereby expressly consent to the making of the payments by George W. Carter Company to Ethel M. Carter in the amounts and for the purposes herein provided, and do hereby expressly consent to the retirement of Ethel M. Carter from the partnership upon the terms herein expressed. It is agreed that the transactions and agreements herein expressed shall be accomplished without any dissolution of the present limited partnership known as George W. Carter Company, and that the existence and continuity of said limited partnership shall remain unaffected by the retirement of Ethel M. Carter as a limited partner, by virtue of the present specific unanimous consent and agreement of all the partners as herein expressed.

6. The sums of money to be paid by George W. Carter Company to Ethel M. Carter, as hereinabove provided, shall be paid in all events regardless of the profits or losses incurred by George W. Carter Company subsequent to December 31, 1955, and Jackson Investment Company and West Shore Company hereby jointly and severally guarantee to Ethel M. Carter that such payments shall be made to her by George W. Carter Company promptly when due. In consideration of said guarantees, Ethel M. Carter hereby agrees that the payments to be made to her as herein provided shall be substituted for and shall be in full satisfaction of all payments and rights to which she might otherwise be entitled under said Limited Partnership Agreement dated as of September 14, 1950, and said Certificate of Limited Partnership dated January 22, 1951, and in full satisfaction of all claims that she may have against West Shore Company and

Jackson Investment Company, or either of them. George W. Carter Company, Jackson Investment Company and West Shore Company do hereby jointly and severally agree to hold harmless and indemnify Ethel M. Carter from and against all past, present or future liabilities of George W. Carter Company and from and against any and all claims which may be made against Ethel M. Carter on account of any past, present or future liabilities of the George W. Carter Company.

\* \* \* \* \* \* \*

10. Jackson Investment Company, a corporation, and West Shore Company, a corporation, hereby release and discharge Ethel M. Carter of and from every claim, demand and obligation of every kind, nature and description which may heretofore have existed in their favor or which might hereafter accrue to their favor with respect to any matter, thing or event which may heretofore have existed or taken place, excepting only obligations provided for in, or arising out of, this agreement.

11. Ethel M. Carter hereby releases and discharges Jackson Investment Company, a corporation, and West Shore Company, a corporation, and each of them, as well as the partnership business and its assets, of and from every claim, demand and obligation of every kind, nature and description which may heretofore have existed in her favor or which might hereafter accrue to her favor with respect to any matter, thing or event which may heretofore have existed or taken place, excepting only obligations provided for in, or arising out of, this agreement.

\* \* \* \* \* \* \*

15. In the event of the default in the payment of any installment due hereunder, and should said default continue for a period of fifteen (15) days from and after the date written notice is given by Ethel M. Carter to Jackson Investment Company and West Shore Company, the said Ethel M. Carter, at her option, may declare immediately due and payable any unpaid balance payable to her under the terms of this agreement.

16. It is agreed that this agreement confirms and evidences the agreement heretofore made orally by the parties hereto as of December 31, 1955, effective January 1, 1956, and that the reduction of the agreement to writing was necessarily delayed by the work of the accountants in determining the figures to be set forth herein in accordance with the formulas previously agreed upon by the parties. \* \* \*

Respondent's determinations as to each petitioner as regards the sole remaining issue are identical. They do not disturb Partnership's treatment of the $19,650 purportedly paid to Ethel as for her 15-percent interest in the net assets of Partnership, but add to the distributive shares of each petitioner, from Partnership, by adding to Partnership's ordinary net income for the years in issue the sums totaling $40,350, denominating them "purchase expense" as follows:

| | |
|---|---|
| 1956 | $16,680 |
| 1957 | 13,150 |
| 1958 | 10,520 |

"Purchase expense" is explained, "It is determined that no deduction is allowable for any portion of the payments to the retiring partner, Ethel M. Carter. Section 736 of the Internal Revenue Code of 1954."

The applicable portions of said section [1] are:

SEC. 736. PAYMENTS TO A RETIRING PARTNER OR A DECEASED PARTNER'S SUCCESSOR IN INTEREST.

(a) PAYMENTS CONSIDERED AS DISTRIBUTIVE SHARE OR GUARANTEED PAYMENT.— Payments made in liquidation of the interest of a retiring partner * * * shall, except as provided in subsection (b), be considered—

(1) as a distributive share to the recipient of partnership income if the amount thereof is determined with regard to the income of the partnership, or

(2) as a guaranteed payment described in section 707(c) if the amount thereof is determined without regard to the income of the partnership.

(b) PAYMENTS FOR INTEREST IN PARTNERSHIP.—

(1) GENERAL RULE.—Payments made in liquidation of the interest of a retiring partner * * * shall, to the extent such payments (other than payments described in paragraph (2)) are determined, under regulations prescribed by the Secretary or his delegate, to be made in exchange for the interest of such partner in partnership property, be considered as a distribution by the partnership and not as a * * * guaranteed payment under subsection (a).

(2) SPECIAL RULES.—For purposes of this subsection, payments in exchange for an interest in partnership property shall not include amounts paid for—

(A) * * *

(B) good will of the partnership, except to the extent that the partnership agreement provides for a payment with respect to good will.

The main thrust of respondent's argument is that the "except" clause of section 736(b)(2)(B) applies to the facts of this case so that the three payments to Ethel totaling $40,350 are nondeductible partnership distributions. Respondent states his position on brief:

the payments did not constitute "guaranteed payments", but instead constituted payment for good will *as provided in the partnership agreement* as amended and, as such * * * fall within Section 736(b)(2)(B) * * * and * * * accordingly * * * are not deductible by the partnership. [Emphasis added.]

　　＊　　　　＊　　　　＊　　　　＊　　　　＊　　　　＊　　　　＊

Although the original partnership agreement did not provide for payments to be made to a retiring partner for good will * * *, the partnership agreement was amended to provide specifically for payment for good will.

Respondent would also have us read into section 736(a)(2) a requirement that every payment made in liquidation of the interest of a retiring partner, also satisfy the requirements of section 707(c) in that it be paid "for services or the use of capital," and conclude that since the payments here totaling $40,350 were for neither, they were therefore not "guaranteed payments" and were nondeductible.

We cannot agree with either of respondent's positions.

As to the one last mentioned we can see nothing in the statutory language or in the regulations to limit the interest of the retiring partner which is being liquidated to items of "services" and "use of capital." Indeed, to do so would be to render section 736(b)(2)(B)

---

[1] All references are to I.R.C. 1954.

entirely meaningless unless a sale of goodwill (in connection with a liquidation) be arbitrarily called a payment for use of capital.

Section 736 is the only section dealing with liquidation of the interest of a retiring partner by means of payments from the partnership, and it is clear that it was intended by Congress to be all inclusive [2] of every interest the retiring partner might have. Subsection (b)(2)(B) deals specifically with goodwill, denominating the payment for it as a "distribution" (and thereby qualifying for capital gain or loss treatment by payee) if the partnership agreement provided for the payment, or as a "guaranteed payment" (and thereby fully taxable to payee and deductible by the partnership) under subsection (a)(2) if said agreement did not so provide (and if the payment is determined without regard to the partnership's income).

This brings us to respondent's main argument, which is that the terms of the agreement dated May 7, 1956, must be construed, first as an amendment of the then existing partnership agreement or articles and only thereafter as the agreement under which Ethel's entire interest in Partnership was liquidated and payments made therefor.

We believe it would be entirely possible for partners to enter into such a dual purpose agreement, which would first amend articles and then provide for the retirement of a partner under the newly amended articles, but we do not believe that that was done by the partners in this case. It seems to be clear that one of the principal reasons for the addition of this section to the 1954 Code was to permit partners to control the tax results, *inter sese*, upon the retirement of a partner. See *V. Zay Smith*, 37 T.C. 1033, affd. 313 F. 2d 16 (C.A. 10), where we said at page 1038:

This interpretation will also make for the flexibility and equity between the partners stressed by Congress. It will allow the partners flexibility in that they may determine the tax consequences of a liquidation payment by the choice of words in the partnership agreement.[7] * * * [Footnote omitted.]

See also *David A. Foxman*, 41 T.C. 535 (1964).

The critical question presented by the instant case, therefore, amounts to a pure factual determination, to be resolved from *all* of the provisions of the agreement itself. *Miller* v. *Robertson*, 266 U.S. 243, 251. The question is narrow. If the oral understanding of the parties, arrived at on December 31, 1955, and reduced to writing on May 7, 1956 (but as of December 31, 1955), was solely concerned, as respects Ethel, with the terms of her retirement and the liquidation

---

[2] SEC. 761. TERMS DEFINED.

(d) LIQUIDATION OF A PARTNER'S INTEREST.—For purposes of this subchapter, the term "liquidation of a partner's interest" means the termination of a partner's entire interest in a partnership by means of a distribution, or a series of distributions, to the partner by the partnership.

[The relevant committee report regarding sec. 736 is S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 395-396.]

of her entire interest in the partnership, then the payments in issue fall under section 736 (a) (2) and are deductible by Partnership and are ordinary income to Ethel. But if such understanding was first to amend and change Partnership's articles so that Ethel could then retire and her interest be liquidated under the articles as amended, then the payments in issue fall under section 736 (b) (1), are not deductible by Partnership, and are entitled to capital gain or loss treatment by Ethel.

We have critically examined the May 7, 1956, agreement and cannot adopt respondent's view. True, it is labeled "Amendment of Limited Partnership Agreement" and section 761 (c) provides that a partnership agreement is to be considered as including any modifications, but this is a part of the same factual determination.

Insofar as the agreement made provisions for a carrying on of business activities by Jackson Investment Co. and West Shore Co., it was an amendment of Partnership's articles, but none of these provisions could affect Ethel in any way. Every provision made regarding Ethel, the retiring partner, is a provision having to do with her retirement and the liquidation of her entire interest in Partnership. The agreement recites that the payments provided for are "in full liquidation, satisfaction and settlement of * * * [Ethel's] * * * entire partnership interest * * * in * * * [Partnership's] * * * property, business and good will * * * "; it provides that Ethel is surrendering her right to compel a dissolution of Partnership (the only right she then possessed) ; and it provides that the limited partnership is continuing as to the other two partners. In the event of default as to any payment to Ethel, she is given no right to rescind or reenter the partnership, but simply a right to accelerate any remaining payments.

Most importantly the agreement specifically provides that the $40,350 in payments to Ethel, here at issue, were to be "as a guaranteed payment, or a payment for good will." Certainly the parties would not have attached conflicting labels to this payment in this carefully drawn instrument. But respondent's position gives those labels ("guaranteed payment" and "good will") opposite tax consequences.

It is clear, and respondent does not dispute, that a "guaranteed payment" would be fully deductible by Partnership and taxable to Ethel. The only way that a payment for her "good will" can have this same tax result is to construe the agreement as one of retirement only as to Ethel, and as an amendment of articles, only as to the two continuing partners.

Further, the agreement provided for what was essentially a covenant not to compete. Ethel agreed not to use the George W. Carter name for several years as an inherent element in the retirement agreement. Far from amounting to an amendment of articles, this portion of the

agreement spells out a fairly complete covenant not to compete. This negatives the amendment of articles theory.

Respondent seems to argue that every agreement to pay a retiring partner for his interest in partnership goodwill (the articles being silent) would *ipso facto* become an amended partnership provision. That this approach would entirely frustrate section 736(b)(2)(B) demonstrates its fallacy. The question is a factual one and we have so resolved it. Respondent also argues that section 761(c) which provides that a partnership agreement includes all modifications made thereto prior to, or at, the time for filing tax returns, controls our determination of the identity of the articles under which Ethel retired. But this argument simply begs the question.

There is no conflict between the instant case and *V. Zay Smith*, supra.[3] In *Smith* we held that intent could not replace words in the determination of whether a partnership agreement provided for goodwill. Here we are required to and do interpret existing words to find their meaning and effect in an ambiguous factual context.

Ethel is not before us as a petitioner and we do not know what treatment she accorded the payments totaling $40,350 here in issue. Respondent expresses fears on brief that "each retiring partner * * * [by amending the partnership agreement] * * * would obtain the benefits of capital gain treatment * * *, and the partnership would, at the same time, be deducting the payments from its partnership income." We observe that the regulations directly oppose this view. Income Tax Regs., sec. 1.736–1(a)(4):

Payments, to the extent considered as guaranteed payments under section 736(a)(2), are deductible by the partnership under section 162(a) and are taxable as ordinary income to the recipient under section 61(a). * * *

And see *V. Zay Smith*, supra.

On the record before us, the relevant payment for goodwill is within the purview of section 736(a)(2) and is deductible by the partnership.

Because of a concession, and because petitioners failed to contest certain adjustments made by respondent's determinations,

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

BRUCE, *J.*, concurs in the result.

WITHEY, *J.*, concurring: I concur in the result reached by the majority and agree that the payment made to the retiring partner was not made under an agreement which constituted an amendment to

---

[3] This case differs from *V. Zay Smith*, 37 T.C. 1033, affd. 313 F. 2d 16 (C.A. 10), in which case the identity of the articles under which Smith retired was certain and we concluded that such articles did not provide for any payment with respect to goodwill. Here it is the identity of the articles under which Ethel retired which must be determined.

the partnership agreement but do not agree that it was in consideration of the retiring partner's share of the goodwill under section 736, I.R.C. 1954. In my view the consideration for the payment above the value of tangible assets was as stated in the agreement "as consideration for Ethel M. Carter's not requiring a dissolution of the partnership." Clearly the payment is a guaranteed payment within the meaning of the cited section and the only relationship to goodwill is that of a convenient label.

---

RAUM, *J.*, dissenting: Although the statutory provisions are complicated, there is no dispute that, pursuant to section 736(b)(2)(B), an amount paid to a retiring partner in respect of his share of the firm's goodwill is not to be charged to him as a distribution of ordinary income if "the partnership agreement provides for a payment with respect to good will." And, concomitantly, such payment is not deductible in determining the distributive shares of the remaining partners. This, too, is not in dispute.

The reason for making the tax consequences turn upon the agreement of the parties was spelled out in *V. Zay Smith*, 37 T.C. 1033, 1037–1038, affirmed 313 F. 2d 16 (C.A. 10), and further elaborated in *David A. Foxman*, 41 T.C. 535. It was to permit the partners themselves, in a field where the partners' interests in respect of tax liability are antagonistic to one another, to fix such tax liabilities *inter sese* by arm's-length bargaining. In terms of the present case, it was left to the partners to determine the tax consequences of a payment for goodwill by the manner in which the partnership agreement was written. If the partnership agreement specifically provided for such payment, that was to be the end of the matter. Cf. *V. Zay Smith*, *supra*. What was the situation here in respect of the partnership agreement?

Admittedly, there was no provision for goodwill payments in the *original* partnership agreement. But the heart of this case is section 761(c), which defines "partnership agreement" as follows:

(c) PARTNERSHIP AGREEMENT.—For purposes of this subchapter, a partnership agreement includes *any modifications of the partnership agreement made prior to*, or at, *the time prescribed* by law *for the filing of the partnership return* for the taxable year (not including extensions) which are agreed to by all the partners, * * *. [Italics supplied.]

And it seems all too clear to me that the agreement of May 7, 1956, herein, which did specifically provide for a goodwill payment, was such modification. The majority opinion does not dispute the fact that there may be a "modification" of the partnership agreement in the instrument that terminates the status of one of the partners as a member of the firm. Indeed, a familiar example of such modification

is a provision changing the withdrawing partner's distributive share of partnership income for the final period during which he remained a partner. *David A. Foxman*, 41 T.C. 535 (second issue). The pivotal question herein then becomes simply whether the May 7, 1956, agreement is to be treated as a "modification" of the partnership agreement. I think that question admits of only one reasonable answer.

The May 7, 1956, agreement was entitled "Amendment of Limited Partnership Agreement of George W. Carter Company" and provided in part: "Whereas, the parties hereto now wish to amend said Limited Partnership Agreement, and to agree to amend said Certificate of Limited Partnership." The plain language of the agreement indicates that the parties intended it to be treated as an amendment to the original partnership agreement and certainly this express provision by them should not go unrecognized by us.

To fail to give effect to the plain language thus used by the parties is, I think, to defeat the very purpose of the pertinent partnership provisions of the statute, namely, to permit the partners themselves to fix their tax liabilities *inter sese*. Although the May 7, 1956, agreement may be inartistically drawn, and indeed may even contain some internal inconsistencies, the plain and obvious import of its provisions in respect of the present problem was to amend the partnership agreement so as to provide specifically for a goodwill payment. This is the kind of thing that section 736(b)(2)(B) dealt with when it allowed the partners to fix the tax consequences of goodwill payments to a withdrawing partner. And this is what the partners clearly attempted to do here, however crude may have been their effort. I would give effect to that effort, and would not add further complications to an already overcomplicated statute.

TIETJENS, PIERCE, MULRONEY, DRENNEN, and HOYT, *JJ.*, agree with this dissent.