JULIAN E. JACOBS AND JANE S. JACOBS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Jacobs v. Commissioner
Docket No. 3255-71.
United States Tax Court
T.C. Memo 1974-196; 1974 Tax Ct. Memo LEXIS 122; 33 T.C.M. (CCH) 848; T.C.M. (RIA) 74196; July 30, 1974, Filed. *122 Payments were made by a medical partnership to a withdrawing partner in liquidation of his partnership interest. The terms of the payments were contained in an agreement modifying the partnership agreement. Held: that the modifying agreement specified that certain payments were with respect to goodwill and, therefore, the payments come within section 736(b) (1). Elton B. Taylor, for the petitioners. Wright Tisdale, Jr., for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined deficiencies in petitioners' income taxes for the calendar years 1967 and 1968 in the amounts of $1,247.50 and $3,645.25, respectively. The only issue presented is whether monthly payments received by petitioner in liquidation of his interest in a partnership were ordinary income or capital gain. FINDINGS OF FACT Some of the facts have been stipulated and they are so found. Dr. Julian E. Jacobs and Jane S. Jacobs, residents of Myrtle Beach, S.C., filed their individual income tax returns for the taxable years 1967 and 1968 with the district director of internal revenue, Columbia, S.C. Jane is a party to this proceeding solely by virtue of having filed a joint *123 income tax return with her husband. Hereafter we will refer to Dr. Julian E. Jacobs as petitioner. Petitioner is a doctor of orthopedic medicine. He first began private practice in 1939 as an associate of the Miller Clinic, a medical partnership located in Charlotte, N.C. Petitioner had known Dr. O. L. Miller, founder of the clinic, while petitioner was a resident physician at Duke Medical Center. After joining the clinic, petitioner continued at Duke as a part-time instructor in medicine. Throughout his medical career petitioner engaged in various activities relating to his specialty and became well known in North Carolina. He wrote numerous articles, taught and served in various organizations dealing with orthopedic surgery. He also served on several hospital staffs in positions including chief of orthopedic service and chief of staff. During 1966 Mrs. Jacobs suffered from conjunctivitis, asthma and skin allergies. She consulted several medical specialists who suggested that a visit to the seashore might improve her condition. Consequently, the Jacobses visited Myrtle Beach, S.C., in the latter part of 1966. During their stay Mrs. Jacobs' condition so improved that she *124 and petitioner decided to move to Myrtle Beach permanently. Because Myrtle Beach is 174 miles from Charlotte, petitioner realized that he would have to withdraw from the partnership in order to make the move. The Miller Clinic which existed in 1966 was substantially different from the Miller Clinic which petitioner joined in 1939. The original partnership dissolved in 1954 and a second one, consisting of petitioner and Dr. O. L. Miller, was formed. Dr. Chalmers Carr joined as a third partner in 1955. By January 1966 the partnership consisted of seven active members, including petitioner. Dr. O. L. Miller had become physically disabled by that time, however, and he was no longer an active member of the partnership. As Dr. Miller had become progressively less active in partnership matters, Dr. Carr had assumed more administrative duties. By 1966, Dr. Carr was managing partner. He was also petitioner's closest friend within the clinic. Dr. Carr was, therefore, the first member of the clinic to be notified of petitioner's intention to withdraw from the partnership. In either December 1966 or January 1967 the two men held a conversation during which petitioner explained his reasons *125 for leaving the clinic. The conversation also involved the question of what payments petitioner might be entitled to upon withdrawal. In order to fully determine petitioner's rights, the two men examined the clinic's partnership agreement. When the partnership was formed in 1954, an oral agreement was adopted. Eight years later a written agreement dated July 2, 1962, was adopted and that document as amended was still in effect at the time petitioner notified Dr. Carr of his intention to withdraw. Parts of that agreement pertinent to our inquiry are as follows: XIV. Death of a partner. The death of a partner for purposes of this agreement shall be deemed to have occurred on the last day of the calendar month during which such death actually occurs. Upon the death of a partner, the surviving partners shall purchase and the estate of the deceased partner shall sell and transfer to the surviving partners the deceased partner's interest in the partnership upon the following terms and conditions. A. All payments to be made by the surviving partners for the interest of the deceased partner in the partnership shall be made to the beneficiary designated in writing by the deceased partner, *126 which designation shall bear the signature of the deceased partner and shall be attached to and made a part of this agreement; PROVIDED, HOWEVER, that if any partner does not so designate a beneficiary as provided herein such payments shall be made to the estate of the deceased partner or its beneficiaries in the event said estate has been closed. B. Upon the death of a partner and within thirty (30) days from the date on which his death is deemed to have occurred, the surviving partners shall pay in cash to the designated beneficiary of the deceased partner the deceased partner's share of any undistributed net profits of the partnership through the date on which his death is deemed to have occurred. C. Within thirty (30) days from the date on which the death of a deceased partner is deemed to have occurred, the surviving partners shall pay in cash to the designated beneficiary of the deceased partner the amount of the deceased partner's equity in the partnership as reflected by the deceased partner's equity account on the date on which his death is deemed to have occurred. D. The surviving partners shall pay to the designated beneficiary of the deceased partner for the deceased *127 partner's interest in the accounts receivable and goodwill (if any) of the partnership an amount equal to the average of the deceased partner's share in the net profits of the partnership for the five years preceding the date on which his death is deemed to have occurred (or the average of such years as the decedent has been a partner if less than five such years) which amount shall be allocated to the deceased partner's interest in the accounts receivable and goodwill (if any) of the partnership as follows: (1) a portion thereof, that is, a portion equal in amount to sixty percent of the accounts receivable of the partnership which are less than six months old as reflected by the books of the partnership on the date on which the deceased partner's death is deemed to have occurred multiplied by the percentage in which the deceased partner shared in the net profits of the partnership on such date, shall be allocated to and shall constitute the sales price for the deceased partner's interest in all accounts receivable of the partnership; (2) the remainder of the purchase price, if any, shall be allocated to and shall constitute the sales price for the deceased partner's interest in the *128 goodwill of the partnership. E. The payments to the designated beneficiary of the deceased partner for his interest in the accounts receivable and goodwill (if any) of the partnership, as hereinbefore provided, shall be made in sixty (60) equal, monthly installments, the first such installment being due and payable one month from the date on which his death is deemed to have occurred. * * * XV. Disability of a partner. * * * XVI. Retirement from the partnership. Upon attaining the age of 60 years any partner may retire from the partnership at the end of any calendar month by giving at least sixty (60) days prior written notice of such intention to the other partners. * * * A partner who has retired shall be entitled to and shall receive the same rights, benefits and payments as provided in this agreement with respect to the death of a partner * * * XVII. Withdrawal from the partnership. Any partner may withdraw from the partnership at the end of any calendar month with the mutual consent of the other partners or by giving written notice of withdrawal of not less than thirty (30) days, and, upon such withdrawal and within twenty (20) days thereafter, the withdrawing partner shall *129 be paid in cash by the remaining partners (1) his undistributed share of the net profits of the partnership including any retained profits, up to the date of his withdrawal, and (2) his equity in the partnership as reflected by his equity account on the date of his withdrawal. A partner who withdraws from the partnership shall forfeit his interest in the accounts receivable and goodwill, if any, of the partnership. Because petitioner was 57 and in good health he and Dr. Carr concluded that petitioner, as a withdrawing partner, was legally entitled to payments for his "equity interest" and his share of undistributed net profits but that he had no right to any other payments. The word "equity" was used by the partnership to represent tangibles of the partnership such as typewriters and X-ray machines. Although petitioner realized he was only entitled to payment for his equity interest, [1] *130 he nonetheless indicated that he intended to leave the partnership. He did state, however, that in spite of the agreement he hoped Dr. Carr would talk to the other partners and "see what he could get" in the way of additional payment for petitioner. Following the initial conversation between Dr. Carr and petitioner negotiations were held with respect to petitioner's withdrawal, in which petitioner acted on his own behalf and Dr. Carr represented the partnership. From the outset there was no doubt regarding petitioner's right to payment for his equity interest. Dr. Carr agreed, moreover, that the partnership agreement should be modified in order to provide petitioner with payment in addition to the payment for his equity. There is conflicting testimony, however, as to what was said about the additional payment. [2] *131 It was finally determined that the additional payment should be in the amount of $35,000. Dr. Carr prepared a memorandum to assist the clinic's counsel, now Judge Arbuckle, in writing a withdrawal agreement. The withdrawal agreement was written by Judge Arbuckle and submitted to the remaining partners for their approval. The agreement was executed by petitioner and the other partners on February 20, 1967. That document provided as follows: 1. That Dr. Julian E. Jacobs shall continue active in the partnership through and including the 30th day of June, 1967. 2. That on and after the 1st day of July, 1967, Dr. Chalmers R. Carr, Dr. Robert E. Miller, Dr. Basil M. Boyd, Jr., Dr. Charles F. Heinig, Dr. H. William Tracy and Dr. Richard N. Wrenn will continue to practice the profession of medicine and orthopedic surgery as partners under the name and style of The Miller Clinic and under the Articles of Partnership presently in effect along with any additional partner or partners who may be properly admitted to the partnership on or before the date last mentioned. It is specifically provided that the Articles of Partnership are hereby modified only to the extent of effecting the withdrawal of Dr. *132 Julian E. Jacobs as a partner as of the time specified, and the remaining partners do hereby readopt said Articles as so modified and agree that the partnership as constituted on July 1, 1967 shall be governed thereby subject only to any future modifications or amendments as shall be properly made in accordance with the terms thereof. It is further agreed that the withdrawal of Dr. Julian E. Jacobs from the partnership under the terms herein provided covers only the special circumstances of his particular case and is in no wise to be considered as a precedent governing any future withdrawals on retirements. 3. That on the withdrawal of Dr. Julian E. Jacobs as a partner the remaining partners then constituting The Miller Clinic will pay to Dr. Julian E. Jacobs in full satisfaction of his interest in the partnership and its good will the following: (a) His share in the equity of The Miller Clinic at its value on the 30th day of June, 1967 according to the records of the partnership, said payment to be made in one lump sum on or before August 1, 1967. In the event any question arises as to the value of such share then and in that event the partnership's accountants, Templeton, Wallace *133 and Yandle, Johnston Building, Charlotte, North Carolina shall ascertain said value and their determination thereof shall be final and binding on all the parties hereto. (b) The further sum of Thirty-five Thousand ($35,000.00) Dollars payable in thirty-six (36) consecutive monthly installments of Nine Hundred Seventy-two and 22/100 ($972.22) Dollars the first payment to be due and payable on or before the 10th day of August, 1967 and subsequent installments to be due and payable on or before the 10th day of each calendar month thereafter until the 10th day of July, 1970 when the final payment shall be due. In the event of the death of Dr. Julian E. Jacobs after the 1st day of July, 1967 and before payment has been completed the monthly installments remaining due shall be paid as they fall due to the legal representative of his estate or to such person or persons as may be certified by such legal representative to be entitled thereto, provided however that the full unpaid balance may be made by and with the consent of all parties in one final lump sum and in full satisfaction of this Agreement. 4. That as a part of the consideration moving to the parties of the first part to pay *134 the amounts hereinabove set out and to make and continue the monthly installments hereinabove provided for, Dr. Julian E. Jacobs hereby contracts and agrees that during the period of three (3) years next following the date of his withdrawal from the partnership he will not on his own account or as an associate with any other physician engage in or become financially interested in the practice of medicine in the City of Charlotte, North Carolina or within a one hundred (100) mile radius therefrom. [3]
5. It is further agreed by and between the parties hereto as follows: (a) That as of the 30th day of June, 1967 Dr. Julian E. Jacobs will be relieved of any and all individual liability under the Lease with Twiford Investment Company dated the 1st day of July, 1965 all as provided for in Article XXIII, Paragraph B, Section (2) of said Lease. (b) That as of the 30th day of June, 1967 Dr. Julian E. Jacobs will be relieved of any and all obligation under that certain Trust Agreement with the First Union National Bank of North Carolina dated the 1st day of September, 1965 pursuant *135 to Paragraph 5 thereof. The remaining partners, being the parties of the first part, do hereby agree to the release by the Trustee to Dr. Julian E. Jacobs of the insurance policies hypothecated with the Trustee by Dr. Julian E. Jacobs under the aforesaid Trust Agreement and do further agree to secure the written approval of the Commercial Department of the First Union National Bank of North Carolina to the release of said insurance policies it being understood that said release shall not be made until July 1, 1967. (c) That the parties of the first part will assume proportionately among themselves any and all indebtedness of the partnership including its indebtedness to the First Union National Bank of North Carolina for building improvements beginning the 1st day of July, 1967 and they do further covenant and agree to relieve and save Dr. Julian E. Jacobs harmless from any and all liability thereafter occurring. (d) That the party of the second part does hereby assign, transfer, release and forever quitclaim unto the parties of the first part all his right, title and interest in and to any and all assets of The Miller Clinic owned as of July 1, 1967 including all sums of money *136 due upon the accounts receivable of The Miller Clinic which are outstanding on July 1, 1967, whether or not billed, and the party of the second part further agrees that he will remit to The Miller Clinic any and all sums of money which may be paid direct to him for any medical services rendered prior to the 1st day of July, 1967, and he further agrees to cooperate in all reasonable ways to secure for the parties of the first part full payment of any and all unpaid accounts arising out of and in connection with any medical services he may have rendered while a partner in The Miller Clinic. 6. This agreement shall be binding not only upon the parties hereto but also upon their heirs, executors, administrators, successors and assigns, and the parties hereto agree to execute any instrument in writing which may be necessary or proper to carry out the purposes and intent of this agreement. The final agreement did not use the same wording that had been in Dr. Carr's memorandum, but he and the other partners assumed that the final agreement conveyed the intention of his memorandum. Petitioner continued to participate in the partnership until June 30, 1967, when he withdrew. During 1965, *137 1966 and the part of 1967 when petitioner was in the clinic he saw considerably more patients than the other doctors in the partnership. The Miller Clinic's balance sheet dated June 30, 1967, was as follows: ASSESTS:
CASH IN BANK
$ 9,121.90
CASH IN SAFE
.00
PETTY CASH
500.00
RETURNED CHECKS 10.00
$ 9,631.90
Equipment and Leasehold
Cost of Building Improvements
$291,471.26
Less Accumulated Depreciation 84,476.03
206,995.23
Total
$216,627.13
LIABILITES:
Notes Payable - First Union Nat'l Bank [4]
$166,983.44
Capital Due Dr. O. L. Miller
1,756.47 -168,739.91
Balance
$ 47,887.22 PARTNERS' EQUITY
balance June 1-67
June 30
Total
JEJ
$ 6,048.16
$ 6,723.10
$12,771.26
CRC
6,048.16
6,704.14
$ 12,752.30
REM
6,048.17
6,935.73
12,983.90
RN
6,048.16
6,774.46
12,822.62
RMB
6,048.16
6 788.95
12,837.11
CFH
6,048.17
6,795.12
12,84 .29
hwt
6,048.16
6,763.42
12,811.58
Totals
$42,337.14
$47,484.92
$89,822.06
*138 m04,00,12,12,12 Withdrawal Balance In Now Balance should be JEJ$ 5,930.22 $ 6,841.04 $ 6,841.04 crc 5,911.26 6,841.04 6,841.04
REM 6,142.86 6,841.04 6,841.04
RNW 5,981.59 6,841.03 ,841.03
BMB 5,996.09$$6,841.02 6,841.02
CFH6,002.26 6,841.03 6,841.03
HWT 5,970.56 6,841. 2 6,841.02 Totals $41,934.84 $47,887.22 $47,887.22 ACCOUNTS RECEIVA BLE: [5]
Private and Work. Comp. Accts.
$266,766.60
Medical-Legal Accounts 101,201.94
$367,968.54
Accts. With Medical-Dental Cr. Bureau 111,315.53
Total Accts. Receivable
$479,284.07
Shortly after petitioner departed from Charlotte he received a check from the partnership in the amount of $6,841.04 which represented payment for his share of the clinic's equity account. Petitioner also received 31 monthly checks from the partnership dated August 1, 1967, through February 2, 1970, each in the amount of $972.22. All 31 checks bore the notation "payment of Agreed Share of Accounts Receivable." Petitioner requested that his first check for $972.22 be deposited in a bank account. Miss A. H. Lee, an employee of the partnership, sent a letter to petitioner dated August 4, 1967, in which the receipt *139 for the deposited check was enclosed. In the letter Miss Lee stated: Enclosed you will find Wachovia Bank and Trust Company receipt for deposit of The Miller Clinic's check in the amount of $972.22 which represents first payment on your "Agreed Share of Accounts Receivable". * * * On January 31, 1968, Mr. G. Guy Wallace, accountant for the clinic, wrote in a letter to petitioner the following: You should notice that the income from the partnership includes the guaranteed payments made to you of $4,861.10. [6] If you report this item in addition to the amounts shown above, it will be duplicated. On its partnership income tax return for 1967, the clinic claimed a deduction in the amount of $4,861.10 for "Guaranteed payments." In a letter, dated "3/2," [7] written to Mr. Arthur M. Jenkins, the attorney who had advised petitioner that the monthly "goodwill" payments would entitle petitioner to capital gains treatment, petitioner stated: Enclosed check from Miller Clinic for the usual $900+ per mo. - for 1st time it had on left corner "your share of accounts receivable as per agreement" - so, thought you should know if this meant anything? *140 * * * On the monthly check from the partnership dated July 1, 1968, petitioner endorsed the check and above his endorsement made the notation: Accepted and endorsed as a payment under paragraph 3(b) of Amendment to The Miller Clinic Partnership agreement dated February 20, 1967. Some checks having dates subsequent to July 1, 1968, bore the same notation. Petitioner reported $4,861.10 and $11,666.64 as long-term capital gain from goodwill payments on his income tax returns for the years 1967 and 1968, respectively. The deficiencies were asserted by respondent on the grounds that the monthly payments were taxable as ordinary income because they were either for unrealized accounts receivables or guaranteed payments. The monthly payments received by petitioner in 1967 and 1968 were payments for goodwill. OPINION Whether a transaction constitutes a sale of an interest in a partnership within section 741[8] or a liquidation of an interest within section 736 depends upon the intent of the parties to the transaction. David A. Foxman, 41 T.C. 535, 552 (1964), affd. 352 F.2d 466 (C.A. 3, 1965). The parties to the agreement, as well as *141 respondent, are in full accord that a liquidation was intended. We shall, therefore, proceed on that basis. The only issue presented for our consideration is the character of the monthly payments of $972.22 which petitioner received under subparagraph 3(b) of the 1967 agreement from the Miller Clinic in 1967 and 1968. In so framing the issue respondent and petitioner were primarily concerned with the question of whether the partnership agreement specified that the monthly payments were with respect to goodwill. [9]
Under the amendment to the partnership agreement petitioner received $6,841.04 in payment for his share of the partnership's equity account and a total of $35,000 in monthly payments by February 1970. [10] *142 There is no controversy as to the $6,841.04 payment. Section 736(a) requires that payments by a partnership to a retiring partner other than payments which come within section 736(b) shall be considered as either a distributive share of partnership income or as a guaranteed payment. Payments which come within section 736(b) are those which are for: (1) a retiring partner's interest in partnership property; or (2) goodwill where the partnership agreement provides for a payment with respect to goodwill. Respondent contends that if petitioner had received payment for his share of equity account, *143 his entire share of accounts receivables and some additional amount, then the additional amount might arguably represent goodwill. He further states that those facts are not present in this case. While we do not agree with respondent's analysis of the facts, his statement raises a point which bears further consideration. The clinic's balance sheet as of June 1967 indicates that the partnership had $479,284.07 in accounts receivable. Evidence has been presented that the partnership generally collected 90 percent of its accounts receivable. This percentage applied to petitioner's one-seventh interest amounts to $61,622.24. It would, therefore, appear that petitioner was entitled to a payment for his interest in accounts receivable which would be in excess of $35,000 if he was to receive his share of such accounts. Paragraph XVII of the partnership agreement dated July 2, 1962, provides that any partner who withdraws from the partnership (rather than retires under paragraph XVI) forfeits his interest in partnership accounts receivable. [11] Consequently, petitioner was not entitled to a payment for accounts receivable. He was only legally entitled to a payment for his equity interest *144 under the 1962 agreement. Thus, the $35,000 payment which was provided for in the 1967 modification was in the nature of a premium and as such it might be for goodwill. Respondent maintains that the payment could not have been for goodwill because the partnership's balance sheet did not have an entry for it. We disagree. It is true that there was not an entry for goodwill, but goodwill might exist nonetheless. Section 1.736-1(b) (7), ex. 3, Income Tax Regs. Cf. Frederic R. Harris, Inc., 40 T.C. 744, 750 (1963); John G. Moffatt, 42 T.C. 558, 579 (1964), *145 affd. 363 F.2d 262 (C.A. 9, 1966), certiorari denied 386 U.S. 1016 (1967). For it is only when goodwill has been paid for that there would be an entry therefor. Respondent also contends that the $35,000 could not be for goodwill because under the 1962 agreement petitioner forfeited his interest in goodwill. Paragraph XVII of the 1962 partnership agreement also states that any partner who withdraws from the partnership rather than retiring at age 60, or over, forfeits his interest in partnership goodwill. Respondent quotes paragraph 2 of the 1967 agreement for the proposition that the 1962 agreement was only changed by the deletion of petitioner as a partner. As a result respondent feels that the 1967 agreement has no effect on paragraph XVII of the earlier agreement. That is not our reading of paragraph 2. The sentence of that paragraph which directly bears on this point is as follows: It is further agreed that the withdrawal of Dr. Julian E. Jacobs from the partnership under the terms herein provided covers only the special circumstances of his particular case * * * [Emphasis supplied.] The sentence preceding the one we have quoted lends some support to respondent's position since *146 it states that "The Articles of Partnership are hereby modified only to the extent of effecting the withdrawal of Dr. Julian E. Jacobs * * *." It is clear from the entire 1967 agreement, though, that the terms of petitioner's withdrawal from the partnership were contained in that agreement. To the extent that the 1962 document is inconsistent with the 1967 agreement, the former, including paragraph XVII, is modified and amended by the latter. As such we must examine the amendment to determine if it provided for a payment with respect to goodwill. Commissioner v. Jackson Investment Company, 346 F.2d 187 (C.A. 9, 1965), reversing 41 T.C. 675 (1964). 11a
In determining whether an agreement provides for payment with respect to goodwill "the test to be applied will normally be the relatively mechanical one of searching for a particular phrase * * *." V. Zay Smith, 37 T.C. 1033 at 1038 (1962), affd. 313 F.2d 16 (C.A. 10, 1962). Unfortunately, however, *147 "the provisions of section 736 are not fully understood and, to the extent that they are understood, are horribly mangled in the application." Willis On Partnership Taxation, p. 437 (1971). It is, therefore, necessary when confronted with an inartistically described payment "to pay deference to what we may determine was the revealed intent of the parties." Jackson Investment Company, supra.
This requires examination of the amendment and only the amendment. See V. Zay Smith, supra, and Jackson Investment Company, supra. For that reason the conflicting testimony of Dr. Carr and petitioner is to be disregarded.[12] *148 The facts of this case exemplify the rationale of the rule established in the above cases. Here, the two men who negotiated for petitioner's withdrawal, Dr. Carr and petitioner, were medical men. Yet, at the time of trial, in 1972, they were asked to recall what was said in 1967 regarding goodwill, accounts receivable and other terms having technical meaning in the law of taxation. Furthermore, at the time of negotiations they were apparently not aware that their interests were adverse, but by the time of trial such was presumably not the case. Respondent contends that the amendment did not provide for a payment with respect to goodwill. He maintains that "any reference to goodwill [in paragraph 3] was only to make it explicitly understood that this was petitioner's final quitclaim on the Miller Clinic." Respondent then states that provision for the payment of $35,000 follows the paragraph in which mention is made of goodwill. He asserts, moreover, that paragraph 5(d), wherein it is provided that petitioner quitclaims his interest in all assets including money due upon the clinic's accounts receivable, means that petitioner relinquishes his interest in the accounts receivable and that in substance this represents an assignment of the right to receive future income for which the $35,000 was paid in consideration. We do not accept any of respondent's arguments. While respondent is correct that the provision for the payment of $35,000 follows the paragraph in which the word "goodwill" appears, he ignores the fact that the provision for the $35,000 payment (3(b)) is a subparagraph of the goodwill paragraph 3. It is paragraph 3, moreover, which deals specifically with the characterization of the payments made to petitioner. *149 The statement referring to accounts receivable is contained in a separate subparagraph (5(d)) and no specific consideration is mentioned. It is clear that subparagraph 5(d) contains a quitclaim which is precautionary rather than substantive. Paragraph 3 is not completely clear, but we believe it reveals an intent on the part of the parties to pay petitioner with respect to goodwill. It states that "The Miller Clinic will pay to Dr. Julian E. Jacobs in full satisfaction of his interest in the partnership and its good will * * *." It, therefore, appears that the partnership intended to pay petitioner for two items. [13] Those two items are dealt with more fully in the two subparagraphs (a) and (b) of paragraph 3. Subparagraph (a) deals with the first item, petitioner's "interest in the partnership." It indicates that petitioner's "interest in the partnership" and his "equity interest" are synonymous for purposes of the agreement. In our opinion subparagraph (b) deals with the second item, petitioner's interest in goodwill, and as such specifies that the $35,000 was for this interest. Accordingly, we hold that the partnership agreement as amended by the 1967 agreement does provide *150 for a payment with respect to goodwill and, therefore, the payment comes within section 736(b). Petitioner makes the statement that he will not have sustained his burden in this case without proof that there was in fact goodwill and respondent does not contest that assertion. [14] *151 Goodwill may be present in a personal service partnership, section 1.736-1(b) (7), ex. 3, Income Tax Regs., and it is clear from the record that goodwill did in fact exist in the instant case. The clinic or its predecessor had served the people of Charlotte and surrounding areas for over 28 years and petitioner had been with the clinic for 28 years. Petitioner was active within his profession and he held numerous responsible positions relating to orthopedic medicine. He was well known and respected both within the North Carolina medical profession and among the citizens of Charlotte. A valuation of $35,000 was placed upon petitioner's share of goodwill in the partnership agreement as amended. Accordingly, that valuation shall "be regarded as correct," in the absence of evidence that such an amount was unreasonable. Section 1.736-1(b) (3), Income Tax Regs.
Our conclusion that the payments come within section 736(b) (1) does not dispose of the matter. Section 736(b) (1) states that "Payments made in liquidation of the interest of a retiring partner * * * shall * * * be considered as a distribution by the partnership * * *." Accordingly, we must look to section 731(a). Andrew O. Stilwell, 46 T.C. 247 (1966). That section provides as follows: (a) Partners. - In the case of a distribution by a partnership to a partner - (1) gain shall not be recognized to such partner, except to the extent that any money distributed exceeds the adjusted basis of such partner's interest in the partnership immediately before the distribution * * * * * * Any gain or loss recognized under this subsection shall be considered *152 as gain or loss from the sale or exchange of the partnership interest of the distributee partner. Section 731(c) states, however, that section 731(a) "shall not apply to the extent otherwise provided by * * * section 751 * * *." Section 751(b) provides: (b) Certain Distributions Treated as Sales or Exchanges. - (1) General rule. - To the extent a partner receives in a distribution - * * * (B) partnership property (including money) other than property described in subsection (a) (1) or (2) in exchange for all or a part of his interest in partnership property described in subsection (a) (1) or (2), such transactions shall, under regulations prescribed by the Secretary or his delegate, be considered as a sale or exchange of such property between the distributee and the partnership (as constituted after the distribution). Property described in section 751(a) (1) and (2) are unrealized receivables and inventory items which have substantially appreciated. While accounts receivable are defined as both unrealized receivables and inventory items section 1.751-1(d) (2) (ii), Income Tax Regs., [15] we have found that petitioner forfeited his interest in accounts receivable pursuant to paragraph *153 XVII of the 1962 agreement and such forfeiture was not modified by the 1967 agreement. Consequently, he had no interest in section 751 property, at withdrawal, to exchange and section 751 is inapplicable. Section 731, therefore, applies. That section looks to section 741. Under section 741 petitioner's gain is a capital gain. Decision will be entered for the petitioners. [16]
Footnotes
1. There was apparently little discussion with regard to petitioner's share of undistributed profits. 2. Petitioner testified he was offered a choice of collecting accounts receivable of patients he had seen which were worth approximately $70,000 or accepting $35,000 over a period of 36 months as his share "in the partnership as goodwill." He further testified that he decided to accept the $35,000 on advice of counsel since he would be given capital gains treatment on these payments as goodwill. Petitioner's testimony was corroborated by his counsel, Mr. Jacobs. Dr. Carr testified that the $35,000 was intended to represent payments on account receivable.
3. Respondent apparently concedes that no part of the $35,000 can be attributed to the covenant not to compete. ↩
4. The partnership minutes dated April 15, 1965, indicate that the notes were given to the bank in order to secure a loan to the partners which was used to pay for additions to and remodeling of the building occupied by the clinic. The minutes further state that the notes were signed by all the partners in the partnership at that time except Dr. O. L. Miller. ↩
5. The partnership generally collected 90 percent of its accounts receivable. ↩
6. Petitioner received 5 checks of $972.22 during 1967. ↩
7. Evidence was presented that the year was 1968. ↩
8. All statutory references are to the Internal Revenue Code of 1954, as amended. ↩
9. In presenting the case the parties assumed that petitioner's basis in the partnership was $6,841.04 without regard to sec. 752(a)↩. We have assumed a basis of that amount. 10. We note that the Miller Clinic's balance sheet of June 30, 1967, has an entry for liabilities in the amount of $166,739.91 and that petitioner was relieved of his share of such liabilities under subparagraph 5(c) of the 1967 agreement. The liabilities incurred by partners must be considered in determining a partner's basis in a partnership and in deciding the amount realized upon a partner's withdrawal from the partnership under section 752. Andrew O. Stilwell, 46 T.C. 247 (1966); Frank A. Logan, 51 T.C. 482 (1968). The parties have not raised the issue of the effect of partnership liabilities on the transaction in issue, however, and the assumption of and relief from liabilities in the instant case will not alter the amount of gain nor the character of gain. Cf. Edward H. Pietz, 59 T.C. 207↩ (1972). 11. It should be noted that "accounts receivable" is a category of "unrealized receivables" as defined by section 751(c). In forfeiting his interest in "accounts receivable" petitioner did not forfeit his interest in all "unrealized receivables." No evidence has been presented respecting "unrealized receivables" other than "accounts receivable," however. The record lacks evidence with respect to unbilled fees, for example. See Frank A. Logan, supra.↩Nor is there evidence with respect to section 1245 or 1250 recapture. For purposes of our discussion we will, therefore, presume that the only "unrealized receivables" were "accounts receivable." 11a. The Ninth Circuit, in reversing our decision in Jackson Investment Company, rested its opinion on a different interpretation of the evidence presented. The reversal did not involve a contrary position with respect to the law involved. ↩
12. See footnote 2, supra. 13. We have used this word for convenience. We do not use it as it is used in section 702(b) or section 704(b). ↩
14. Because the parties are in accord we shall not consider the matter further. It appears, however, that there is a divergence of opinion with respect to whether a withdrawing partner must prove that goodwill existed. Compare footnote 2 of V. Zay Smith, supra, with section 1.736-1(b) (3), Income Tax Regs. Also see Willis On Partnership Taxation, p. 433, and 32 Taxes, p. 958↩. 15. The regulations are correct in that section 751(d) (2) (B) refers to property "other than a capital asset and other than property described in section 1231," and section 1221(4) includes accounts receivable. For further discussion of the relationship of accounts receivable in section 751(c) and section 751(d) (2) (B)↩, see Willis On Partnership Taxation, pp. 234 and 235. For a discussion of the relationship which is critical of the regulations see 15 N.Y.U. Tax Inst. 135 (1957). 16. Petitioner recovered an amount equal to his presumed basis before reporting gain. In the absence of an election under sec. 1.736-1(b) (6), Income Tax Regs., cost recovery is proper under sec. 731(a). See sec. 1.736-1(b) (7)↩, ex. 1, Income Tax Regs.